IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 18, 2016 Session

**KELLEY ELIZABETH CANNON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2809    Mark J. Fishburn, Judge**
_____

**No. M2015-01869-CCA-R3-PC – Filed March 21, 2017**
_____

A Davidson County jury convicted the Petitioner, Kelley Elizabeth Cannon, of first degree premeditated murder and a life sentence was imposed. On direct appeal, this Court affirmed the Petitioner's conviction and sentence. *State v. Kelley Elizabeth Cannon,* No. M2010-01553-CCA-R3-CD, 2012 WL 5378088, at *1 (Tenn. Crim. App., at Nashville, Oct. 30, 2012), *perm. app. denied* (Tenn. May 9, 2013). The Petitioner filed a post-conviction petition alleging ineffective assistance of counsel, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that she received the ineffective assistance of counsel, asserts that the post-conviction court erred by preventing her use of trial exhibits for a demonstration and challenges the validity of the search warrants in this case. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Kelley Elizabeth Cannon.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

On June 23, 2008, James Cannon, (hereinafter, "the victim") the Petitioner's husband, was found dead in his home in Nashville, Tennessee. The couple had three children, and the victim had filed for divorce in February 2008. At the time of the murder, the victim lived in the marital residence and the Petitioner lived in a nearby apartment. At trial, the jury convicted the Petitioner of the first degree premeditated murder of the victim. On appeal, this Court summarized the facts presented at the Petitioner's trial as follows:

On September 2, 2008, the [Petitioner], Kelley Elizabeth Cannon, was indicted for the first degree murder of James Cannon, her husband, in violation of Tennessee Code Annotated section 39-13-202 (2008). Prior to her trial, the [Petitioner] filed a motion to suppress two statements that she had given to police and a motion to suppress evidence seized during three police searches of the crime scene - the [Petitioner]'s former marital residence. The trial court denied these motions following a hearing. The [Petitioner] also filed a motion *in limine* concerning certain anticipated testimony regarding a prior domestic dispute between the [Petitioner] and the victim, and a motion challenging the admissibility of certain expert testimony. The trial court also denied these motions.

At the [Petitioner]'s trial on April 26-29, 2010, the State presented the following evidence:

The first witness for the State was the son of the [Petitioner] and the victim, who testified that he was born on September 16, 1990, [sic] and was eleven years old at the time of trial. He testified that he had one younger brother and one younger sister. He testified that after his mother had moved out of the former martial home, only he, his two siblings, and his father (the victim) still lived in the residence. He testified that after his mother moved out of the house, he and his brother started sleeping in their parent's former bedroom, and his dad would sleep either in his office or in the boys' former bedroom.

The witness testified that on the night of the incident he had fallen asleep, along with his brother, in his parent's former bedroom. He testified that sometime after he fell asleep that night, his mother woke him up and told him "we just have to go." He testified that he asked his mother if he could get a pillow from his former bedroom, but his mother told him "no." When he was awakened, he realized that his brother and sister were already ready to leave. He believed the time was between 1:00 a.m. and 2:00 a.m. He

2

testified that his mother would normally come before 9:00 p.m. when she wanted to pick up the children.

The victim's son testified that when they were leaving, the [Petitioner] led all of them down the front set of stairs, rather than down the more convenient back set of stairs near his former bedroom where his father had fallen asleep. He testified that he did not enter or retrieve anything from his former bedroom before they left, including any clothes. He testified that the [Petitioner] seemed "nervous and like jumpy" when she woke him, and because of this, he felt scared and was confused as to why she was there. The witness testified that after they left the former marital residence, the [Petitioner] took all three children to the apartment where she had been living. The witness testified that the [Petitioner] did not talk to them at any point during the car ride. He also testified that the [Petitioner] did not make any phone calls or do anything else before she went to sleep after they arrived at her place.

The witness testified that the following morning, they had been watching cartoons for a few hours when the police knocked on the door. He testified that he assumed that his dad had sent the police to find them. He testified that the [Petitioner] talked to the police for a while and that he and his siblings were placed into a patrol car afterward.

The witness testified that before the night of the incident, the [Petitioner] and the victim had gotten into a "big fight," and the [Petitioner] had chased after the victim with a knife in an effort to prevent him from calling the police. The witness testified that the [Petitioner] eventually caught the victim, knocked him to the ground, and succeeded in taking the battery out of the his cell phone, but the victim had already called the police. The witness clarified that he had seen the victim push the [Petitioner] all the way to the ground on that occasion. The witness testified that following this confrontation, the [Petitioner] went back into the marital residence, retrieved his younger sister, got into her vehicle, smashed into the back of the victim's car, and drove away with the police in pursuit.

On cross-examination, defense counsel questioned the witness concerning a prior statement he had given to police in which he had not mentioned asking to get a pillow on the night of the incident. The witness testified that he remembered that he wanted to retrieve a pillow from his former bedroom because he knew that the [Petitioner]'s pillows did not "give any cushion to your head." The witness also clarified that he could not be

3

entirely sure where his father had slept on the night in question because he had gone to bed before his father, but he testified that his father had told him that he was going to sleep in the boys' former bedroom that evening. The witness testified that he had informed other individuals that his mom "looked nervous and jumpy" prior to his recent testimony and explained to them that she appeared this way "because she was on drugs and stuff." The witness testified that he could not remember watching any television at the [Petitioner]'s apartment before he went to sleep on the night of the incident, and he could not remember precisely where he and his siblings had slept. The witness claimed that his memory of these events was "fuzzy" because he had been really scared at the time.

Ms. Vicky Shams, the victim's housekeeper, testified that she had been hired by the [Petitioner] and that she had been working for the family for approximately six weeks by the time of the incident. She testified that soon after the [Petitioner] hired her, the [Petitioner] moved out of the house and she never saw the [Petitioner] again. She testified that on June 23, 2008, she arrived at the victim's house at 8:30 a.m., as was her usual practice. She testified that when she tried to let herself into the house with her key, she discovered that the front door was unlocked. After entering the residence, she also noticed several other unusual things - including the fact that the back door was open, numerous items in the house were out of place, the children did not appear to be awake, and there was no sign of the victim, even though he normally left for work at 9:00 a.m.

Ms. Shams testified that the victim also employed two nannies, which he had hired after the [Petitioner] moved out. Ms. Shams testified that at least one of these nannies, and sometimes both, would arrive each morning. She testified that soon after she arrived on June 23, 2008, one of those nannies, Ms. Karley Dewey, also arrived. Ms. Shams testified that soon thereafter she went upstairs to check on the victim's youngest child - an eighteen-month-old toddler who should have been awake by that time - and that she discovered that she was not in her crib and that the other children were gone as well. She testified that a number of things upstairs appeared out of place. She testified that she saw a wine glass and an overturned trash can in the master bathroom, a chest of drawers out of place in the children's bedroom, and a bloody towel beside one of the beds. She testified that she took the bloody towel downstairs with the rest of the dirty clothes and started washing it in the washing machine. She testified that she placed the wine glass, which appeared to have once contained red wine, in the kitchen sink. She testified that she informed the nanny that no one was at home,

4

and the two had a discussion after which they eventually decided that one of the children must have gotten hurt and been taken to a hospital.

Ms. Shams testified that she asked the nanny to follow her upstairs to help her return the chest of drawers to its normal location. She testified that the chest of drawers in the boys' bedroom had been placed against the bedroom closet with its drawers facing the closet door. She testified that the two of them moved the chest of drawers, and then she opened the closet door. She saw the victim lying on the floor inside. She testified that his skin was dark and his hands appeared to be the color of charcoal. She testified that she immediately slammed the door and asked for the nanny to call 911. A short time later, she opened up the closet door again to make sure that the victim was not merely unconscious. She confirmed that he was deceased. She testified that she could detect the strong smell of bleach coming from the closet, and there was a bleach bottle lying on the closet floor.

Ms. Shams testified that emergency medical personnel arrived shortly thereafter. She testified that she asked the nanny to call the victim's mother-in-law (the [Petitioner]'s mother), whom she had met previously. She testified that the nanny did so and handed her the phone. She testified that she informed the victim's mother-in-law that the victim was dead. She testified that she was shocked by the victim's mother-in-law's response. She testified that the victim's mother-in-law's response indicated that she already knew that the victim was dead. Following this testimony, Ms. Shams identified several photographs taken of the crime scene, and these were authenticated and entered into evidence.

On cross-examination, defense counsel questioned Ms. Shams concerning a statement she had given to detectives the day following the murder. In this statement, Ms. Shams told the police that when she arrived on the day of the murder, the house appeared as though it had been completely unattended for the last three days and that she had discovered many alcohol bottles in a brown paper bag downstairs. Ms. Shams testified that finding these alcohol bottles struck her as unusual because there was "already plenty of alcohol" in the home. Ms. Shams testified that she remembered telling the detective that she had thought that the victim might have been highly intoxicated the night before and that he had perhaps been so for the entire weekend. Ms. Shams testified that during the time she worked for the victim she had seen him drink every day, but she had never seen him drink more than one drink per day.

Ms. Shams testified that she put the wine glass she discovered that day in the kitchen sink because she intended to wash it but that she gave it to police before she did so. Ms. Shams testified that she told the police that she initially thought that the victim might have knocked over a dresser upstairs because he had been drinking and had become upset with the children. Ms. Shams testified that she initially told the police that she did not believe that the victim had actually slept in the boys' bedroom the night before because it was his habit to take the lamps off the nearby dresser and put them down on the bunk bed with him when he did so. She testified that when she entered the boy's bedroom, she did not see those lamps in the bunk bed, and consequently she did not believe initially that the [Petitioner] [sic] had slept there the prior evening. Ms. Shams also testified that she stopped the nanny from calling 911 for a brief period of time so she could check on the victim, because she thought that the victim might have been drinking and had just passed out, and she did not want to embarrass the victim if this had occurred. On redirect examination, Ms. Shams testified that she had never seen the victim become intoxicated, and she had never seen him drink more than one drink per day.

Mr. John Hollins, Jr., testified that he was a lawyer who specialized in domestic relations and divorce and that he represented the victim. Mr. Hollins testified that the victim contacted him in February of 2008 concerning getting a divorce from the [Petitioner]. Mr. Hollins testified that on February 29, 2008, the victim met with him in his office and gave him the information that formed the basis of the divorce complaint, which he filed the same day. In conjunction with this divorce action, Mr. Hollins testified that he filed a request to have the victim receive temporary custody of the three children, which was granted. Mr. Hollins also testified that he requested a restraining order against the [Petitioner] preventing her from threatening the victim, harassing him, or harming him in any way, and the judge granted that order as well. Mr. Hollins testified that the judge's order also prevented the [Petitioner] from using or abusing any narcotic medication, alcohol, or drugs in any way.

Mr. Hollins testified that he also requested the judge to issue a restraining order giving the victim exclusive possession of the parties' former marital home, so that the victim and the children could live at the former marital residence by themselves. Mr. Hollins testified that the judge did not grant that request at the time, and it was his belief that the judge had not done so because that type of relief had to be sought through a temporary injunction rather than a restraining order. Mr. Hollins testified that he filed a motion

6

for a temporary injunction for the same purpose on March 3, 2008, which included additional information about the history of events that had occurred between the parties. He testified that the judge granted the victim's request for an injunction on March 4, 2008, giving the victim exclusive possession of the former marital residence and preventing the [Petitioner] from coming to the house or interfering with the victim's possession of the house in any way. Mr. Hollins testified that all these orders were still in effect at the time of the victim's death.

Mr. Hollins testified that he received a phone call from the victim on May 22, 2008, concerning an incident of domestic violence that had occurred the previous evening. Mr. Hollins testified that he advised the victim that he should file a new application for a restraining order, this time in criminal court, stating that he was the victim of domestic violence. He testified that the victim sought and received an ex parte order of protection on May 22, 2008, from the criminal court. He testified that the requisite hearing concerning this ex parte order of protection was delayed on one occasion while the [Petitioner] sought to obtain new representation, and, as a consequence, the ex parte order was still in effect at the time of the victim's death.

Mr. Hollins testified that he received a phone call from the victim's mother-in-law just before lunch on Monday, June 23, 2008, informing him that the victim was dead. He testified that a police officer then got on the phone and asked him to bring any relevant court documents to the crime scene and that he did so.

On cross-examination, Mr. Hollins testified that he was aware that the victim was a lawyer, but he was unaware that the victim had previously done some divorce work. Mr. Hollins testified that he was aware that the victim had transferred all of his interest in the former marital home to the [Petitioner] by quitclaim deed in October of 2005. Mr. Hollins explained that the victim had done so for bankruptcy and estate planning purposes, but he acknowledged that at the time of the victim's death the [Petitioner] was the sole title owner of record of the former marital residence.

Mr. Hollins testified that he was not aware that the [Petitioner] had consulted with a divorce lawyer as early as October of 2007, and he was unaware that the [Petitioner] had made allegations of marital infidelity concerning the victim. Mr. Hollins testified that among the various allegations that he had made when he had requested a temporary injunction

from the divorce court were allegations that (1) on March 6, 2008, the [Petitioner] had "collapsed in the lobby of the Loews Vanderbilt Plaza," (2) on that occasion, she had to be rushed by ambulance to a hospital, where she was given intravenous fluids, and (3) when all this occurred, the [Petitioner] weighed approximately ninety pounds.

Mr. Hollins testified that in the days following the filing of the divorce action there was an informal agreement struck between the [Petitioner] and the victim. Pursuant to this agreement, if the [Petitioner] would enter into drug and alcohol treatment, the victim would consider letting her back into the marital home. Mr. Hollins testified that despite this informal understanding, they did not seek to change any of the court orders because it was his desire to have a sixty-day trial period to determine whether the treatment that the [Petitioner] received was going to be effective. Mr. Hollins testified that had the [Petitioner]'s treatment proven effective, he would have gone to court and sought to have the orders changed, retroactive to the date that the [Petitioner] had entered treatment. However, Mr. Hollins testified that they never got through the informal sixty-day trial period. Mr. Hollins testified that although the [Petitioner] was represented by two lawyers with respect to the divorce action, neither lawyer ever filed an answer to the original divorce complaint or any other responsive pleadings to the victim's requests for ex parte and other forms of injunctive relief.

Mr. Hollins testified that the [Petitioner] checked herself into Cumberland Heights Rehabilitation Center on March 6, 2008, for treatment and that she was released in early April of 2008. Mr. Hollins testified that the [Petitioner] was initially welcomed back into the marital home following her release. Mr. Hollins testified that when the [Petitioner] returned to the former marital home, the restraining orders that had been put into place by the divorce court were still in effect. Mr. Hollins testified that on May 21, 2008, the victim complained to him concerning an incident of domestic violence involving the [Petitioner] that had resulted in the [Petitioner]'s arrest. Mr. Hollins testified that he advised the victim to request an ex parte order of protection from the criminal court, which he did, and once this protective order was granted, the [Petitioner] was not allowed to return to the former marital home. Mr. Hollins testified that in the weeks after the [Petitioner] was released from jail, there was an extended period of time when no one - even the [Petitioner]'s lawyers - knew where she could be located. The [Petitioner] did not answer phone calls or text messages during this time period. Mr. Hollins testified that after a few weeks the

[Petitioner] was eventually located, and the victim got her an apartment where she could stay.

Mr. Hollins testified that the day after the victim's death, he contacted an individual working for Northwestern Mutual Life Insurance concerning an insurance policy belonging to the victim that named the [Petitioner] as a beneficiary. Mr. Hollins testified that he could not remember if he had asked this individual to change the beneficiary of the victim's life insurance policy. Mr. Hollins testified that shortly following the victim's death, he filed a wrongful death action against the [Petitioner] seeking $40 million in damages, and he would likely be entitled to thirty percent of any recovery.

On redirect examination, Mr. Hollins clarified that he filed the wrongful death action on behalf of the victim's minor children. Mr. Hollins also testified that one allegation contained in his request for a temporary injunction, concerning the [Petitioner]'s weighing ninety pounds, was made prior to her going into drug rehabilitation. Mr. Hollins testified that he was told that the [Petitioner] needed to be treated on an inpatient basis for sixty to ninety days but that the [Petitioner] would not agree to that and wanted to come home and continue her rehabilitation on an outpatient basis. On recross-examination, Mr. Hollins testified that he was not aware that the [Petitioner] had not received follow-up treatment after she was released from rehabilitation because the victim had refused to pay for it. He explained that it was his understanding that the [Petitioner] simply refused to go. On further redirect examination, Mr. Hollins testified that the victim did not balk at paying for hotel bills, a rental car, and for a condominium for the [Petitioner] and that there had never been any dispute between the parties concerning bills.

The [Petitioner]'s mother testified that on June 23, 2008, her daughter was living in an apartment. She testified that this apartment was about a ten minute drive from the former marital home. She testified that she found out that the victim had been murdered when the victim's housekeeper called her at home. She estimated that this call came in around 8:00 a.m. or 8:30 a.m. She testified that the housekeeper told her that she needed to come to the victim's residence quickly, and she did so. She testified that the police were already there when she arrived. She testified that her grandchildren were not at the residence when she arrived. She testified that she gave the police the names and birthdays of the missing children and that she told the police that the children were probably with their mother, the [Petitioner]. She explained that she told the police this because "[i]t was just the most

9

logical place they could be." She testified that she called both her son (who was in the area) and the victim's lawyer and informed them of the murder, but she did not call the [Petitioner] because she did not have the [Petitioner]'s cell phone number and the [Petitioner]'s apartment did not have a landline. When the prosecutor asked her specifically whether the witness had called her daughter the day before the murder and talked to her for an extended period of time, she denied remembering doing so and denied remembering her daughter's phone number. She also testified that she did not go over to the [Petitioner]'s apartment, or ask her son to go over to the [Petitioner]'s apartment, to inform the [Petitioner] of what had happened even though the [Petitioner]'s apartment was only ten minutes away.

On cross-examination, the [Petitioner]'s mother testified that she and her daughter were "somewhat estranged." She also testified that on the day prior to the murder, she had several conversations with the victim concerning the possibility of their getting together for dinner, but nothing ever came of these plans. On redirect examination, the prosecutor observed that the witness seemed to clearly remember various conversations with her son-in-law on the day before the murder, and asked her if she now could recollect talking with the [Petitioner] for nearly an hour on the same day. The witness claimed she still could not remember any such conversation.

       . . . .

Officer Jeffrey Biggerstaff testified that he was an officer with the Metropolitan Nashville Police Department with seventeen years experience. He testified that he was a training officer and that on the day of the incident, he and a trainee arrived at the crime scene to assist detectives who were already at the scene. He testified that they arrived at the crime scene at approximately 10 a.m. He testified that the detectives in charge requested that he and his partner go to the [Petitioner]'s apartment in an effort to locate the [Petitioner] and her children. He testified that the [Petitioner]'s apartment was approximately half a mile from the victim's house. He testified that when he knocked on the door, the [Petitioner] answered and allowed them into the premises. The officer testified that the [Petitioner] appeared to be calm and that he could also observe the children calmly playing video games.

Officer Biggerstaff testified that the [Petitioner] never asked why they were there. He testified that he told the [Petitioner] that they were there to check

10

on her welfare and the welfare of the children. He testified that he did not tell the [Petitioner] that her husband was deceased. He testified that he instructed the [Petitioner] to remain where she was until the detectives arrived and that he remained at the [Petitioner]'s apartment until they did so.

On cross-examination, Officer Biggerstaff testified that the scene at the [Petitioner]'s apartment appeared to be normal. He testified that he had been instructed by the detectives to notify them when he made contact with the [Petitioner] and her children, but the detectives never instructed him not to tell the [Petitioner] that her husband was dead. He testified that he made this decision to withhold this information on his own.

Officer William Stokes of the Metropolitan Police Department testified that he was a police detective and that he had responded to a call at the victim's house along with another detective, Officer Brad Putnam. He testified that he and Officer Putnam walked through the house after they arrived. He testified that he and another officer, Lieutenant Nancy Felder (his supervisor), then left the crime scene and went to the [Petitioner]'s address. He testified that when he arrived at that location there were already two uniformed police officers there, one inside and one outside the apartment. He testified that the [Petitioner] and her three children were also there and that the two older boys were watching TV. He testified that the [Petitioner] never asked them why they were there.

Officer Stokes testified that he told the [Petitioner] that they would like to speak with her. He testified that he went to the [Petitioner]'s apartment for the purpose of getting a statement from the [Petitioner] and that after she agreed to speak with them he tape recorded her statement. The witness was shown a CD and transcript of that interview, which he authenticated. They were entered into evidence and the interview was played for the jury. The witness also identified the [Petitioner] in open court.

Officer Stokes testified that he and Lieutenant Felder interviewed the [Petitioner] in the bedroom of the [Petitioner]'s apartment, which was the only room in the apartment where they could have some degree of privacy from the [Petitioner]'s older children. He testified that the [Petitioner]'s toddler was present in the room during the interview. He testified that the tape recorder he used to record the interview was not hidden and in the open.

11

On cross-examination, Officer Stokes testified that the first interview with the [Petitioner] lasted for about an hour. He testified that the [Petitioner] answered all of the questions she was asked during this interview, and even directed officers to the location of her rental car in the apartment's parking lot. Officer Stokes also testified that at the end of the interview, when he asked the [Petitioner] if she would be willing to come to the police station for another interview, the [Petitioner] replied "absolutely." Officer Stokes testified that he had been prepared to inform the [Petitioner] that her husband was dead at several points during the interview, but was cut off by his supervisor, Lieutenant Nancy Fielder. At one point during the interview, the [Petitioner] asked the detectives "where is he," referring to her husband, at which point Officer Stokes replied to her: "He's at home." Officer Stokes testified that when the [Petitioner] was finally informed that her husband was dead (fifty minutes into the interview), the [Petitioner] was very emotional and started hyperventilating.

Officer Stokes also testified that on an occasion following the interview he returned to the [Petitioner]'s apartment complex for purposes of serving a warrant. He testified that the [Petitioner] was not home when they arrived, and they waited for her to return. He testified that when the [Petitioner] returned, her vehicle was being followed by a Dodge pickup truck that was being driven by a man. He testified that he saw this man get out of his pickup truck, walk over to the [Petitioner]'s vehicle, and lean into the window. He testified that he never obtained the license tag number of this truck and never interviewed its driver. After the individual left, the officers executed the search warrants and seized several items. Officer Stokes testified that as they were leaving, the [Petitioner] indicated to them that she was concerned for her safety, and he advised her to call the police if she felt threatened.

On redirect examination, Officer Stokes clarified that the [Petitioner] had indicated to him that she was concerned for her safety because she was nervous staying by herself. He testified that he advised her to call the police if she thought anyone was prowling around outside her apartment. On cross-examination, Officer Stokes testified that the man in the truck was still within earshot when they approached the [Petitioner]'s vehicle, identified themselves as police officers, and indicated that they had a search warrant. Officer Stokes testified that the individual got into his truck and left after hearing this information.

Officer Johnny Lawrence of the Metropolitan Nashville Police Department testified that his unit specialized in photographs, fingerprints, collecting evidence, crime scene reconstruction, and bloodstain interpretation. He testified that he investigated the crime scene at the victim's residence on June 23, 2008. Officer Lawrence testified that he created a number of diagrams and took a number of photographs of the crime scene, and he authenticated these items, which were then entered into evidence. Officer Lawrence testified that the tip of a latex glove was discovered in the children's bedroom, with the remainder of that latex glove being found inside the closet door of that same bedroom. Officer Lawrence also explained that he discovered a cell phone charger whose cord was missing and which appeared to have blood on it. He testified that he cut out several pieces of the carpeting in that bedroom because they appeared to have possible bloodstains.

Officer Lawrence testified that there was a strong odor of bleach when he went into the closet of the children's bedroom. He discovered a bleach bottle inside. He testified that further investigation revealed that bleach had been poured and splattered onto the victim's body. Officer Lawrence testified that in the children's bedroom he also discovered a closed water bottle, a pair of eyeglasses, a briefcase, and a man's watch near the bed. The briefcase contained a cell phone and some other items. Officer Lawrence testified that they searched the house but could not find the victim's wallet or his identification, and he testified that to his knowledge those items had never been found. He testified that when he searched the house he came across a partially open window, which he photographed. He testified that he processed the window to see if he could locate any fingerprints, and he was able to lift several fingerprints from the outside of the windowpane.

Officer Lawrence testified that he was given a wine glass, which he processed for fingerprints and DNA. He testified that he collected a box of latex gloves from the laundry supply room of the victim's house. Officer Lawrence also testified in detail concerning the procedures he used to collect and secure the evidence that he collected in the case.

On cross-examination, Officer Lawrence testified that by the time he arrived at the crime scene, numerous police officers, emergency personnel and family members had been in the house. He also testified that he did not see any of the officers at the crime scene wearing the protective booties on their shoes that were designed to protect against biohazards and prevent

13

items of evidence from being tracked from one room to another. Officer Lawrence testified that if the [Petitioner] had lived in the house for three years, he would have expected to find a significant amount of her DNA inside.

Ms. Alicia Mahoney, a crime scene investigator for the Metropolitan Nashville Police Department, testified concerning photographs she took of the crime scene on the morning of June 23, 2008, and additional investigation that she performed. Ms. Mahoney testified that she found two white latex gloves in the backyard behind the victim's residence, one of which was hung on a tree branch. She also testified that she found an empty beer can in the driveway area in the back of the victim's house and an empty beer bottle in a planter in the front yard, which she took into evidence.

Ms. Rhonda Evans, a crime scene technician with the Metropolitan Nashville Police Department, testified that she assisted Officer Lawrence with his investigation of the crime scene on June 23, 2008, by taking a bag of clothing to the property room. She testified that afterward she assisted Officer Putnam with collecting items from the [Petitioner]'s house, including a white tank top, a pair of blue jeans, a pair of white high-heeled shoes, and a box of latex gloves that was labeled "Walgreen's." She also testified that she took latent prints from the crime scene and that she took photographs and lifted fingerprints from the [Petitioner]'s vehicle. She testified that she took a photograph of what appeared to be a piece of a box of latex gloves from inside the [Petitioner]'s vehicle and collected that item. She also testified in detail concerning the procedures that she used to collect and store the evidence that she collected. On cross-examination, Ms. Evans testified that the jeans she took into evidence were a size one and that the T-shirt she received was a size "small."

Ms. Linda Wilson, an analyst in the identification section of the Metropolitan Nashville Police Department, testified that she had fifteen years of experience in analyzing fingerprints and was qualified by the court as an expert in latent print examination. Ms. Wilson testified that nine different sets of prints were discovered at the crime scene and given to her for analysis. She testified that most of the prints she received from the crime scene had no value because they did not have sufficient detail for her to make a valid comparison. She testified that a pair of prints recovered from the front door and from the bathroom sink were of sufficient quality to make a comparison, but did not match either the victim or the [Petitioner].

14

She testified that she was able to identify fingerprints found on the doorframe of the baby's bedroom, as well as prints from a water bottle found in the children's bedroom, as matching the victim. She testified that she was able to identify a print taken from the children's bedroom closet door frame as matching the [Petitioner]. She testified that there were no unidentified prints on the doorframe of that closet door that might have come from someone else. She testified that she had also identified fingerprints that were found on the outside of the partially open window to the victim's house, as well as on the driver's side door of the [Petitioner]'s rental car, as matching the [Petitioner].

On cross-examination, the witness testified that if someone had lived in a house for an extended period of time, their fingerprints would probably be found throughout the residence. In addition, she testified that there is no way to determine how long fingerprints have been on a surface. She testified that she had also examined all of the fingerprints from the crime scene to determine if any matched a man named James Dean Baker (who had an arrest record in the county) and that none did.

Ms. Amy Huston, a mutual friend of the victim and the [Petitioner] and the godmother of the [Petitioner]'s youngest child, testified that sometime in April, following the [Petitioner]'s release from rehabilitation, the [Petitioner] had called her and asked her what the victim knew about her (the [Petitioner]) having affairs. Ms. Huston testified that she told the [Petitioner] that she had no information on the subject. Ms. Huston testified that she had no further contact with the [Petitioner] until Sunday, June 22, 2008. She testified that she received a call from the [Petitioner] around 8:00 p.m. that evening. She testified that the [Petitioner] sounded very upset and asked her if she would call some additional girlfriends and come out and meet her. She testified that she got dressed and went to meet the [Petitioner] by herself at around 9:00 p.m. at an establishment named "Bricktops." She testified that when she arrived, the [Petitioner] was not there. She testified that soon thereafter, the [Petitioner] called her and told her that she had "cut herself shaving," and needed to "run by the drugstore and get a Band-Aid." When the [Petitioner] arrived at approximately 9:30 p.m., she had a Band-Aid on her thumb covering a cut that appeared to have been caused by a straight razor.

Ms. Huston testified that the [Petitioner] ordered a glass of wine and started talking. She testified that the [Petitioner] was making comments such as

15

"how dare he divorce me," and "he can't do this . . . I'm the primary caregiver." She testified that their conversation was not genial.

Ms. Huston testified that in the entire time she had known the [Petitioner], she had never known the [Petitioner] to work outside the home. She testified that she advised the [Petitioner] to get a job so that she could support herself, but the [Petitioner] did not receive this suggestion well. There was some further discussion about jobs requiring a drug test. She testified that she stayed with the [Petitioner] until around 11:00 p.m., and the [Petitioner] had three glasses of wine during this time. She testified that the [Petitioner] received a cell phone call during their conversation, and the [Petitioner]'s cell phone appeared to be working normally. She testified that she could only hear one side of the phone conversation, which sounded like a "marital fight" from her perspective. She testified that during this conversation she heard the [Petitioner] say that "they were her kids and that he could not have them, that they were hers." She testified that she and the [Petitioner] both left the establishment at the same time and that she could see the [Petitioner] sitting in her car, possibly still talking on the phone, as she drove away. Ms. Huston testified that she had known both the victim and the [Petitioner] for a long time and that while the [Petitioner] was "not a large woman," the [Petitioner] [sic] was "not a big man."

On cross-examination, Ms. Huston testified that she considered the [Petitioner] to be a friend, which was why she had gotten out of bed and dressed to go meet her that evening. She also testified that if the [Petitioner] had been in trouble, she would have wanted to help her out and that she had hoped that the [Petitioner] would "address her drug issues and get better." The witness testified that when the [Petitioner] arrived at Bricktops that evening, she had an enormous handbag with her, and she testified that the [Petitioner] may have made some comment to the effect that she was "sort of living out of that bag." The witness testified that the victim was a regular drinker in social settings.

          . . . .

Officer George Ward of the Metropolitan Nashville Police Department testified that he was a patrol officer and that he responded to a domestic disturbance that was reported on May 21, 2008. Officer Ward testified that he was informed by dispatch that the [Petitioner] was taking one of the children and had pushed a vehicle out of the way with her vehicle. When he arrived at the victim's house, he saw a black GMC Yukon at the end of

16

the driveway with the [Petitioner] in the driver's seat. He testified that he saw the [Petitioner] look right at him and make eye contact with him before proceeding to turn left out of the driveway and go in the other direction. Officer Ward testified that he had his lights on but his siren off at this time. He testified that when he saw the [Petitioner] pulling away, he turned his siren on and drove right behind the [Petitioner]. He testified that the [Petitioner] kept accelerating. He testified that when the [Petitioner] had finally reached a speed of 70 mph while still in a 30 mph residential zone, he backed off in order to avoid an accident. He testified that he chased the [Petitioner] for approximately a quarter-mile before he discontinued pursuit.

Officer Ward testified that when he returned to the victim's house, the victim was present. He testified that the victim's shirt was ripped and had a grass stain on it and that the victim's right bicep was bruised. He testified that the victim's vehicle was still at the residence and that there was some damage to the vehicle's rear bumper. Officer Ward took photographs of the victim, his vehicle, and the residence, and he authenticated these items, which were entered into evidence. Officer Ward testified that the [Petitioner]'s vehicle was equipped with OnStar, which he used with the victim's consent to locate the [Petitioner]. He testified that he and a fellow officer assisted the victim in securing an order of protection and in taking out criminal warrants against the [Petitioner].

On cross-examination, Officer Ward testified that he had been to the victim's residence previously, when the [Petitioner] had accused the victim of kidnapping after he had picked the elder boys up from school on the day he filed for divorce. Following Officer Ward's testimony, another officer also testified concerning this earlier domestic disturbance call and its aftermath.

Mr. Aaron Bagley testified that he worked at the Hickory Falls Bar and Grill in Smyrna, Tennessee. Mr. Bagley testified that on May 29, 2008, he was working as a bartender when the [Petitioner] came into the establishment to pick up a "to go" order. He testified that the [Petitioner] stayed for about forty-five minutes and that during that time, she started telling him all about the fact that she was going through a divorce. He testified that she stated that she had discovered her husband was cheating on her and had caught him flying women to come in and see him from other states. He testified that the [Petitioner] told him that if her husband "tried to take the babies" away from her, she would kill him. He testified

17

that she appeared to be very distraught, bitter, and emotionally unstable during this conversation. He testified that the [Petitioner] ate her dinner at the bar and drank several glasses of white wine while she was there. He testified that the [Petitioner] repeated her claim that she would kill her husband a number of different times and in a number of different contexts. He testified that this conversation was unusual and memorable, even for a bartender. He testified that he had never seen the [Petitioner] before that evening and that he never saw her again until he saw her picture on the evening news. Following this testimony, he was shown a restaurant receipt from that evening, which listed his name as the server, and he read the signature at the bottom of that receipt, "Kelley."

On cross-examination, the witness acknowledged that he never called the police concerning this conversation, even though he took it seriously and had access to enough information to identify the [Petitioner]. He also agreed that in his initial statement to police, he indicated that the [Petitioner] looked very skinny and that he had underlined the word "very."

. . . .

Mr. Rick Greene, who had been in treatment with the [Petitioner] at Cumberland Heights, testified that the day following the murder the [Petitioner] called him over and told him that she had been to the former marital residence the night before, had entered it through the already-open front door, and had removed her children when she could not find her husband. Mr. Green further testified that she stated "I can't tell you anything because I don't want to have to lie to you" when he had asked her if she knew that her husband was in the closet that evening.

. . . .

Dr. Thomas Deering, the State's forensic pathologist, testified that the victim weighted [sic] 163 pounds when he died and that he died as a result of strangulation - most likely by ligature. Dr. Deering also testified that there were signs that the victim had suffered multiple blunt force trauma to his head. The victim's body showed signs of post-mortem abrasions consistent with its having been dragged along the carpet. Finally, Dr. Deering testified that while great force had been used to strangle the victim, this force could have been generated by someone who was not overly strong if the assailant had used a ligature and the victim was struggling.

18

Agent Linda Littlejohn of the Tennessee Bureau of investigation, the State's expert in micro-analysis, testified that she had analyzed a piece of a Walgreen's latex glove box that had been found in the [Petitioner]'s car and determined that it matched a torn Walgreen's latex glove box found in the [Petitioner]'s home. She further testified that she had made a physical comparison of the latex gloves found at the crime scene and determined that the three gloves discovered there were inconsistent with gloves coming from a box found at the victim's residence but were consistent with the gloves coming from the Walgreen's box found at the [Petitioner]'s apartment.

Agent Jennifer Shipman, a forensic scientist for the Tennessee Bureau of Investigation and the State's expert in DNA analysis, testified that a DNA test performed on a blood stain found on the [Petitioner]'s jeans revealed DNA from both the [Petitioner] and the victim. She testified that she found the [Petitioner]'s DNA on the inside of the latex glove discovered in the children's bedroom and a mixture of the [Petitioner]'s and possibly the victim's DNA on the outside of that glove. Finally, she testified that blood and DNA belonging to the victim were found on the base of the Motorola phone charger at the crime scene.

Mr. Elliot Webb, Walgreen's loss prevention supervisor, identified and authenticated store surveillance footage taken from a Walgreen's location on Charlotte Pike at 11:17 p.m. This footage, which was played for the jury, appeared to show the [Petitioner] removing a box of latex gloves from a shelf and then exiting the store without paying for it.

Following all of this testimony, the State rested. During a jury-out hearing, the [Petitioner] moved for a judgment of acquittal. The trial court denied this motion, and the [Petitioner] was advised of and waived her right to testify in her own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn.1999). The defense then presented the following testimony:

Officer Freddie Stromatt of the Metropolitan Nashville Police Department testified that he was a detective who had assisted in the homicide investigation involving the victim on June 23, 2008. He testified that he arrived at the crime scene at 9:00 a.m. or 10:00 a .m. and stayed there until 10:00 p.m. or 11:00 p.m. He testified that while he was at the crime scene, arrangements were made for the [Petitioner] to pick up a vehicle from the former marital residence. He testified that he was a part of the discussions

19

arranging for the [Petitioner] to be provided with a vehicle. He testified that at approximately 9:15 p.m. that night, an individual named James Dean Baker arrived at the crime scene and stated that he was there to pick up a vehicle for the [Petitioner]. Officer Stromatt testified that he allowed Mr. Baker to pick up a vehicle for the [Petitioner]'s use. While he was talking with Mr. Baker, he learned that Mr. Baker had met the [Petitioner] at Cumberland Heights Rehabilitation Center. Officer Stromatt testified that he checked Mr. Baker's identification when he picked up the vehicle to see if he had any outstanding warrants and that he determined that Mr. Baker had a criminal record.

On cross-examination, Officer Stromatt testified that his encounter with Mr. Baker occurred as the result of his and other officers' attempts to accommodate the [Petitioner] by affording her a vehicle to drive while her rental vehicle was under investigation. Officer Stromatt testified that he asked Mr. Baker whether Mr. Baker had any knowledge of the events that had occurred in the house the previous evening and that Mr. Baker replied to him that he did not. On redirect-examination, Officer Stromatt testified that he would not just take someone's word that they were not involved in a crime but that to his knowledge neither he nor any of the other officers had ever interviewed Mr. Baker.

Ms. Pamela Jo Brady testified that she was a former administrative assistant for the Marshall Space Flight Center in Huntsville, Alabama, and had known the [Petitioner] since 1989, when the [Petitioner] was hired for a position there. Ms. Brady testified that she and the [Petitioner] developed a friendship outside the office. Ms. Brady testified that she was the maid of honor at the [Petitioner]'s wedding to the victim. Ms. Brady testified that when the [Petitioner] was arrested on May 21, 2008, following a domestic dispute, the [Petitioner] called her, and she made some phone calls on the [Petitioner]'s behalf. She also traveled to Nashville to assist the [Petitioner] following her arrest, and she spent a couple days with her while the [Petitioner] was staying at a hotel. Ms. Brady described the [Petitioner]'s physical appearance in May of 2008 as "visibly shaken, and she had night sweats." Ms. Brady also described the [Petitioner] as "very nervous," "pale and sick," and "seem[ing] to have pneumonia." Ms. Brady testified that the [Petitioner] looked the smallest that she had ever seen her during this time period and appeared to weigh somewhere in the range of ninety pounds. She testified that it was very difficult for the [Petitioner] to talk or communicate during the time she stayed with her at the hotel.

Ms. Brady testified that at one point during her stay with the [Petitioner] at the hotel, she witnessed the [Petitioner] receive a phone call from the victim. When she received the phone call, the [Petitioner] appeared to be visibly shaken, and she stated to Ms. Brady that she did not want to answer the phone because she was afraid that she might be breaching an order of protection. Ms. Brady stated that the [Petitioner] told her "he's called so many times . . . I'm going to see what he wants." Ms. Brady said she listened to the [Petitioner]'s side of the ensuing conversation, and the [Petitioner] stated, "Do not come and get me, no, do not come and get me." She stated that the [Petitioner] started crying and asked, "Jim, why are you doing this, why are you putting me through this, why are you doing this?"

Ms. Brady testified that the following month, in June of 2008, the [Petitioner] came to visit her in Huntsville for the weekend. She testified that the [Petitioner] arrived on Saturday, June 14, 2008, and left on Monday, June 16, 2008. She testified that the [Petitioner] had been scheduled to arrive between 7:00 p.m. and 9:00 p.m. on Friday the 13th, but did not arrive until 2:00 a.m. on Saturday morning. When the [Petitioner] arrived, she appeared dazed and confused. Ms. Brady testified that the [Petitioner] appeared worse physically than when she had seen her in May. She testified that the [Petitioner] was nervous, could not sleep, and had night sweats. Ms. Brady testified that during her weekend visit, the [Petitioner] never expressed any animosity towards the victim. The witness also testified that during the time she knew her, the [Petitioner] was always a loving mother. Ms. Brady testified that she had met the victim on a handful occasions and that the victim always had a drink in his hand.

On cross-examination, Ms. Brady acknowledged that she had not seen the victim in at least six years. She also testified that she was not aware that the [Petitioner] had a drug problem. When the prosecutor asked her if the [Petitioner]'s appearance - including her being nervous and having night sweats - could have been a natural result of the [Petitioner]'s drug addiction, the witness responded, "I'm not medically qualified to answer that question."

Following Ms. Brady's testimony, Dr. Amanda Sparks-Bushnell, the [Petitioner]'s psychiatrist, took the stand. Dr. Bushnell testified that she began treating the [Petitioner] in the spring of 2008 for anxiety, depression, panic disorder, and Post Traumatic Stress Disorder. She testified that she saw the [Petitioner] on an approximately weekly basis between April and June of 2008. She testified that she gave the [Petitioner] her cell phone

number and that the [Petitioner] called her frequently. She testified that the [Petitioner] was "quite small" and that with respect to the [Petitioner]'s appearance, "the term waif like is what keeps coming to mind." Dr. Bushnell stated that when the [Petitioner] wore a sleeveless shirt, she noticed that the [Petitioner] had loose skin on the back of her triceps that was indicative of rapid weight loss and that the [Petitioner] had "no definition between the biceps muscle, the triceps muscle."

Dr. Bushnell stated that she was treating the [Petitioner] with Adderall, Zoloft, Provigil, and Clonazepam. Dr. Bushnell testified that she also prescribed Pristiq later during the [Petitioner]'s treatment when "[h]er anxiety was going beyond what the Zoloft could handle." Dr. Bushnell testified that the [Petitioner] was not psychotic and that she could find no evidence that the [Petitioner] had ever had a psychotic episode.

On cross-examination, Dr. Bushnell clarified that prior to being incarcerated for the victim's murder, the [Petitioner] "was quite gaunt and emaciated" and that she only started to look healthier and put on more weight after her incarceration. Dr. Bushnell testified that if the [Petitioner] had been mixing all the different medications that she had been prescribed with alcohol and/or pain medications, this could have led to some of the behaviors that she had described in her direct testimony.

Dr. Jonathan Arden, the [Petitioner]'s expert in the field [of] forensic pathology, testified that he had reviewed various documents that he had received from the State, including the victim's autopsy report, toxicology report, the medical examiner's investigation report, and photographs of the crime scene and the autopsy. Dr. Arden testified that in his expert opinion, the victim's death was caused by strangulation by ligature. Dr. Arden testified that a substantial amount of force was used over an extended period of time to strangle the victim. Dr. Arden testified that the amount of force that had been used to strangle the victim was far more than was necessary to accomplish the strangulation, and in his opinion the victim was probably strangled in a minute or less but certainly no more than three or four minutes. Dr. Arden testified that in his opinion, it would have taken a strong person to accomplish this strangulation because the ligature had been pulled very tightly and held with a large amount of force. Dr. Arden also testified that the victim had superficial injuries to his face that he believed were probably caused by some kind of altercation. Marks on the victim's neck indicated that the victim was probably moving against the ligature during this altercation.

22

Dr. Arden testified that he had reviewed the victim's toxicology report and found that the victim had a blood alcohol content of 0.15. Dr. Arden testified that a 0.15 blood alcohol content was almost double the amount necessary to qualify for driving under the influence in most states. Dr. Arden testified that an experienced drinker would be able to stand up and have a conversation with a blood alcohol content at that level but would have diminished reflexes and reaction times.

On cross-examination, Dr. Arden testified that he had never interviewed the [Petitioner] and that he was not testifying that it was physically impossible for the [Petitioner] to have strangled the victim. Dr. Arden testified that he was aware that the [Petitioner] had previously worked for a medical examiner's office in Nashville, but he was not aware that she had assisted with autopsies. Dr. Arden agreed with the prosecutor that strength and force were not the same thing. Dr. Arden also agreed that it was possible for the victim to have lost consciousness within ten seconds after the application of the ligature, and he agreed that once the victim lost consciousness it would not take a huge amount of pressure to complete the strangulation. Following this testimony, the [Petitioner] rested.

In rebuttal, the State presented the testimony of Mr. James Dean Baker. Mr. Baker testified that he knew the [Petitioner] because they were in rehabilitation together. He testified that after the [Petitioner] was released from Cumberland Heights, he assisted her with moving and things of that nature. He testified that he spoke with the [Petitioner] on the morning after the victim was killed and that she asked him to help her get her vehicle from her house. He testified that when he arrived at the crime scene, he talked to Sergeant Freddy Stromatt, with whom he was somewhat familiar because he worked with one of the officer's relatives at the fire department. Mr. Baker testified that he retrieved the vehicle and that afterward, he and the [Petitioner] went to an establishment and got something to eat.

Mr. Baker testified that he had never met the victim and that he did not know anything about - or have any personal knowledge of - how the victim came to be murdered. Mr. Baker testified that after he and the [Petitioner] had dinner on the night after the murder, the [Petitioner] spoke with him on the phone and told him that it "wasn't her on the Walgreens video." The [Petitioner] also asked him to pray for her and write her letters.

On cross-examination, Mr. Baker testified that he did "not really" use Cumberland Heights as a way to meet women and that he was unaware that he had a reputation there for being a "flirt." Mr. Baker also acknowledged on the stand that he was involved in a divorce from his wife in 1997 and 1998 and acknowledged that his wife was represented by the victim during that divorce. The witness explained that he had learned this for the first time when his brother had told him that morning, and he explained that his memory from that time period was "blurry" because he was "using crack cocaine pretty bad."

Mr. Baker also denied remembering anything about a restraining order that the victim had obtained for his (Mr. Baker's) wife during their divorce. He denied remembering anything about his going out to his former wife's house with a hack saw and trying to saw through a "club" that was securing the steering wheel of a Mustang, and he claimed that he was not arrested on that occasion. The witness acknowledged that he was terminated from his job at the fire department because of arrests for attempted burglary, stalking, trespassing, and doing drugs. The witness acknowledged frequently calling the cell phones and pagers of members of the 20th Judicial Drug Task Force following his arrest on drug charges. The witness concluded by testifying that police officers had not interviewed him at any point in the last two years, and he testified that they had only contacted him two or three days ago with a request for him to testify at the [Petitioner]'s trial.

After this testimony, both sides rested. The jury was charged, retired to deliberate, and returned sometime later with a verdict finding the [Petitioner] guilty as charged. The [Petitioner] was automatically sentenced to life in prison. On May 28, 2010, the [Petitioner] filed a timely motion for new trial, which was denied by the trial court following a hearing.

*State v. Kelley Elizabeth Cannon,* No. M2010-01553-CCA-R3-CD, 2012 WL 5378088, at *1-19 (Tenn. Crim. App., at Nashville, Oct. 30, 2012), *perm. app. denied* (Tenn. May 9, 2013)

## B. Post-Conviction Hearing

The Petitioner filed a petition seeking post-conviction relief. Thereafter, post-conviction counsel filed three amended petitions, as well as a "Post-Hearing Memorandum in Support of Post-Conviction Relief" and a "Supplemental Post-Hearing Memorandum in Support of Post-Conviction Relief." For the purposes of our review, we

summarize only the post-conviction hearing testimony that pertains to the issues maintained on appeal. Those issues are whether: (1) counsel rendered effective assistance; (2) the post-conviction court erred when it failed to allow the Petitioner to use trial exhibits for in-court demonstrations at the post-conviction hearing; and (3) the Petitioner's jeans were wrongfully seized and examined for DNA.

Related to the Petitioner's claim of ineffective assistance of counsel, she alleges numerous deficiencies: (1) Counsel's failure to challenge the search warrants based upon claims of lack of specificity and lack of probable cause; (2) "generally botching the DNA and serology evidence;" (3) Counsel's failure to pursue a defense based upon the theory that the glove tip was planted; (4) assertions made in opening argument that were later unsupported by the proof; (5) Counsel's failure to "use" exculpatory evidence in the form of phone calls and a "suspicious" footprint found near the victim's body; (6) an inadequate cross-examination of I.C. about his prior inconsistent statements; (7) an inadequate defense of the Petitioner's character; and (8) Counsel's failure to "impeach the victim as a hearsay declarant."

The post-conviction hearing was held over the course of four different days from March 30, 2015, through May 26, 2015, and, during the hearing, the parties presented the following evidence: Assistant District Attorneys General, Katrin Miller and Sharon Reddick, both assigned to prosecute the Petitioner's case, testified about the Petitioner and the victim's son's testimony at trial. In the post-conviction petition, the Petitioner alleged that Counsel was ineffective in his cross-examination of her son, I.C. Ms. Miller testified that she was one of the two assistant district attorney's assigned to prosecute the Petitioner's case, along with Sharon Reddick. Ms. Miller confirmed that a District Attorney's Office victim witness coordinator conducted forensic interviews of two of the Petitioner and victim's children. Ms. Miller testified about some inconsistencies between I.C.'s interview and his trial testimony. She stated that, during the interview of I.C., he stated that, on the night of the victim's murder, his brother was looking for their father, looked in "the bedroom," and their father was not there. At trial, the trial court entered a copy of the forensic interview with I.C. into the record.

Ms. Miller testified that, also during the forensic interview, I.C. stated that, as he exited the upstairs on the night of the murder, he walked by his bedroom on his way to the back stairway and saw a couch against the closet door. At trial, I.C. testified that after the Petitioner woke him up on the night of the victim's murder, he asked the Petitioner if he could get a pillow from his bedroom and that the Petitioner told him he could not. I.C. further testified at trial that on the night of the murder, the Petitioner, I.C., and his siblings left the upstairs of the house by way of the front staircase, rather than the back staircase that was located near I.C.'s bedroom and where the victim's body was found. Ms. Miller recalled that on cross-examination, I.C. was asked about the forensic

interview, and I.C. stated that he did not recall his statements during the forensic interview. Ms. Miller noted that I.C. was nine-years-old at the time of the interviews.

Ms. Miller testified that she visited the crime scene and moved furniture up against the closet in the bedroom where the victim's body was found. She explained that she did so in anticipation of a defense argument that the Petitioner was too small to move the furniture around. The furniture was moved to test this theory.

On cross-examination, Ms. Miller testified that she provided Counsel with all discovery related to this case including the forensic interview. Ms. Miller noted that Counsel never requested to play I.C.'s prior statement from the forensic interview. She explained that there were "many things" in the forensic interview statement that the defense would not want a jury to hear, such as I.C.'s statement that he was afraid of the Petitioner or his statement that the Petitioner did not have custody of her children due to her drug use. Ms. Miller denied procuring perjured testimony and stated that I.C.'s testimony was not the "linchpin of this case."

Ms. Miller testified that Counsel became involved in the Petitioner's case early in the proceedings. Ms. Miller stated that she had worked with Counsel on numerous occasions unrelated to the Petitioner's case and described him as an "excellent trial attorney."

Ms. Miller confirmed that Ms. Reddick conducted the direct examination of I.C. Ms. Miller recalled that during redirect examination, Ms. Reddick had asked I.C. about meeting with her on the Friday before trial. In response, I.C. confirmed that during this pre-trial meeting, he told Ms. Reddick that he did not remember talking with the victim witness coordinator or a police officer two years earlier, near the time of the offense. I.C. testified at trial that, he was "doing [his] best to remember as much as [he] could."

Sharon Reddick testified that she was aware of statements I.C. had made to a victim witness coordinator in her office about seeing furniture in his bedroom on the night of the murder. She testified that the trial was two years after I.C. had made the statements, and, by the time of trial, he no longer remembered the interview. She stated that she called him as a witness because she believed he had important information to offer as it related to the night of the murder and an incident that had occurred prior to the murder. She said that she asked I.C. to testify "about everything that he could remember."

Counsel testified that between June 25, 2008, and April 23, 2010, he met with the Petitioner 112 times, seventy-nine of which were jail visits. Counsel said that, over the

course of his numerous meetings with the Petitioner, he believed that they discussed "about everything." Counsel said that he did not review his opening statement with the Petitioner; however, she knew the substance of the opening statement and what the defense anticipated from Dr. Deering's and Dr. Arden's testimony.

Counsel testified that "physical impossibility formed a substantial part of the defense argument" during the Petitioner's trial. Counsel agreed that he told the jury that the State's expert, Dr. Deering, would testify that "it would require a powerful person to commit this act." He further agreed that Dr. Deering's testimony at trial was not that it was physically impossible for the Petitioner to commit the crime. Counsel explained that he and a retired police detective met with Dr. Deering on January 20, 2010. They spent several hours together reviewing autopsy photographs and discussing Dr. Deering's findings. Dr. Deering provided Counsel with his cell phone number, and Counsel made several follow-up phone calls asking additional questions. Counsel said that any representations he made to the jury about the medical examiner's testimony came directly from his meetings and discussions with Dr. Deering. Counsel acknowledged that Dr. Deering's testimony at trial "back[ed] away a little bit from the very, very strong statements" he had previously made to Counsel. Counsel stated that, in his experience, expert witnesses will "sometimes" "back away" from what they have stated in a prior interview. Ultimately, at trial, Dr. Deering testified that a powerful person committing the crime was "just one possibility."

Counsel testified that, during his meeting with Dr. Deering, Dr. Deering told him that someone of the Petitioner's size and strength could not commit the crime against someone of the victim's size. Counsel said that his statements in opening argument about Dr. Deering's testimony were made in "good faith" and based upon his investigation of the case. He stated that both experts he spoke with about the autopsy results told him that there was a "remarkable amount of damage" and a "great deal of force" was used.

Counsel's notes about his discussions with Dr. Deering indicated that Dr. Deering opined that "someone" could have attacked the victim while he was asleep making it hard for the victim to resist. Counsel explained that, although this possibility was raised in their discussion, he did not believe Dr. Deering would testify that the victim was incapacitated at the time of the strangulation because of the victim's injuries that were consistent with a struggle. Further, Counsel noted that Dr. Deering testified that the victim's head injuries would not have been sufficient to render him unconscious.

Counsel testified that the proof that the Petitioner was in a "very weakened condition" in 2008, weighed ninety pounds, was "waif-like" with "no upper body strength," had skin that hung loosely from her arms consistent with sudden weight loss, and was ill, supported his assertion that the Petitioner was not someone in the physical

27

condition to have "gone toe to toe with a 163 pound man and subdue him by herself and inflict these injuries."

Counsel testified about surveillance video footage of the Petitioner at Walgreens in the hours leading up to the victim's murder, where she obtained a box of Walgreens latex gloves. The surveillance footage did not show the Petitioner paying for the gloves. The trial court made a pre-trial ruling that neither party could say that the gloves had been stolen or shoplifted because no one could determine conclusively whether the Petitioner paid for the gloves. Counsel stated that the Petitioner "insisted" that she had paid for the latex gloves and that he did not believe that she had any intent to steal the gloves. Counsel explained that, due to the trial court's ruling, his statements in opening argument were "necessarily ambiguous" about whether the Petitioner bought the gloves, stole the gloves, or absentmindedly walked out with them. Further, he noted that the surveillance video did not show the Petitioner paying for the gloves. Counsel agreed that he sent his private investigator to Walgreens. He could not recall the date but said that the Walgreens had no record of "any purchase."

Counsel testified about the Petitioner's phone records that were introduced at trial with the relevant calls highlighted. Post-conviction counsel pointed out a phone call that was not highlighted and questioned Counsel about it in relation to the Petitioner's assertion that Counsel was negligent for not using available exculpatory evidence. The phone records indicated that a call was placed from the Petitioner's phone to the victim's phone at 8:08 a.m. on Monday, June 23, 2008. Counsel agreed that the evidence indicated that the victim was killed between midnight and 2:00 a.m. He explained that the calls he highlighted were to show that between June 17 and June 22 there were forty-six phone calls between the victim and the Petitioner's phones. Thirty-five of the phone calls were initiated by the victim and eleven of the calls were initiated by the Petitioner.

When asked whether he thought it would have been "helpful" to point out that, according to the phone records, the Petitioner tried to call someone who was dead; Counsel responded that he believed the State would have used the phone call to the victim to show that the Petitioner was trying to create an alibi. The State had used the Petitioner's meeting with Amy Huston to suggest the Petitioner was creating an alibi in premeditation of the murder and likely would have used the June 23, 2008 phone call to further that theory. He stated that he and the Petitioner assembled what they believed were the most "relevant phone calls" to the defense.

Counsel testified that he was aware that I.C. had made prior inconsistent statements about seeing the bedroom where the victim's body was found on the night of the murder. Counsel said that he did not think it was necessary to play the recorded forensic interview because it had "some things" that were not "particularly helpful." I.C.

had told the interviewer that he was scared by the Petitioner's behavior and scared because the victim "didn't come." He told the interviewer that he was scared because the Petitioner "tried to take [the children]" without the victim's knowledge and that I.C. believed the Petitioner and the victim "were in another fight." I.C. further stated that his parents "fight a lot." Counsel recognized that he needed to "clean up" I.C.'s testimony about being taken down the front stairs of the house as opposed to the back stairwell but decided the "cleanest way to" address I.C.'s prior inconsistent statement was through Detective Putnam. He also recalled that the Petitioner was "pretty devastated" that I.C. had to testify at trial and that she wanted him "off the stand" as quickly as possible. Further, Counsel did not view I.C. as "a critical witness."

Counsel was asked about I.C.'s testimony concerning the Petitioner "standing over [the victim] wielding a knife." Counsel disagreed with this characterization of the testimony and said that I.C.'s testimony was consistent with what the Petitioner had told him about the incident. The Petitioner and the victim were fighting, and the Petitioner had a knife to use in removal of the victim's cell phone battery. Counsel said that there was no implication that the Petitioner was attacking the victim with the knife. Counsel agreed that there was no mention of a knife in the police reports and that the Petitioner was arrested for a misdemeanor assault as opposed to a felony. Counsel stated that he did not object to the testimony because he believed the testimony was that the Petitioner only used the knife to attempt to disable the victim's phone.

Counsel testified that he sought to suppress the admission of the 911 call made by the victim on the basis that the victim was a lawyer and "gratuitously included a bunch of information that was not necessary to resolve the emergency." He recalled that the trial court listened to his argument but ruled against him. Counsel renewed his objection and, on appeal, the Court of Criminal Appeals affirmed the trial court's decision.

Counsel testified that he did not believe the search warrant was overbroad "on its face." He believed the better approach was to file a motion to suppress the Petitioner's statements because it was the Petitioner's statements to the police that were used to establish probable cause for the search warrants. Counsel stated that had his motion to suppress the Petitioner's statements been granted, the search warrant and the resulting seizure of the Petitioner's jeans would not have been admissible. Counsel reiterated that in his "studied professional opinion" he believed that attempting to suppress the statements and thereby "any fruits of those statements was the preferable way to go."

Counsel testified about his approach to the DNA evidence presented at trial. He agreed that his main theory in relation to the DNA was "inadvertent transference," meaning that because the Petitioner had lived in the residence her DNA "necessarily" would have been found in the residence. The presence of the Petitioner's DNA in the

29

residence from when she lived there could have contributed to transference of her DNA to the outside of the glove tip found near the victim's body. Additionally, in furtherance of this defense theory, he stated that there were about thirty or more police officers at the crime scene as well as the domestic help and the EMTs possibly altering the crime scene. As far as the victim's blood on the Petitioner's jeans, Counsel said he had no "good explanation" for it. He agreed this piece of evidence was damaging, as well as the bleach found on the same pair of the Petitioner's jeans.

Counsel testified about his preparation for the DNA evidence in this case as follows:

> I hired Lawrence Kobilinsky, who is one of the I think foremost experts in the field of DNA, consulted with him, traveled at my own expense up to New York to visit with him. As I would in any case, I tried to educate myself as much as I can through interviewing experts and doing my own reading and research. And [the Petitioner] was invaluable in helping with the DNA evidence because of her medical training and back ground. She's got a strong, strong science background.

Counsel said that, based on Dr. Kobilinsky's suggestion, he requested the bench notes and the Tennessee Bureau of Investigation ("TBI") materials. When asked if he requested the TBI's raw data, Counsel said that he believed the raw data was included in the bench notes but, nevertheless, his request was based upon the information Dr. Kobilinsky needed to review the case. Counsel said that he did not believe there was a "significant break" in the chain of custody and, therefore, did not challenge chain of custody.

Counsel testified about his decision not to call Dr. Kobilinsky as a witness at trial as follows:

> Dr. Kobilinsky when it came time as we got closer to trial in February he told me that he was reluctant to write a report - - this is February 16th, 2010 - - that he's reviewed the material, he felt like the TBI crime lab had done what they were supposed to do, he thought that their conclusions were straightforward, he said he can't say anything about the inside of the glove tip, he feared he could not make a difference in the case. He believed that he could assist me with cross-examination, that he could assist me with concepts like transference, and help me in cross-examining the State's expert. He said he did not want to make things worse for [the Petitioner], once he's on the stand he's anybody's expert. And those were the reasons why he was not advanced as a witness.

30

Counsel said that he spent "a lot of time" talking with the Petitioner about the DNA evidence and an explanation for the DNA on her jeans. Counsel agreed that he did not call an expert to testify that a presumptive blood test did not confirm that the substance was blood. He said that, based upon the testimony that multiple items that had presumptively tested for blood were not blood, "it was pretty obvious" that the preliminary test did not equate with a finding of blood. At trial, during cross-examination, Counsel asked the TBI DNA analyst about whether she had excluded the substance found on the Petitioner's jeans as semen, and she responded that she did not test the substance for semen. Counsel explained this strategy, saying that, under the guidance of his expert witness, he "obliquely referenc[ed]" that the TBI did not know what the substance was in an attempt to "blunt the force [of the testimony] that it was blood on her jeans."

Counsel described the presence of DNA on the glove tip recovered from the crime scene outside the door where the victim was found strangled as "a problematic piece of evidence." He reiterated that his tactic was to assert that the Petitioner's DNA would naturally be all over the house because she had resided there. The defense position was that while the Petitioner was living in the residence, she used latex gloves for cleaning, dying her hair, and other purposes. Counsel stated that he sent the glove tip to an expert, John Nordby.[1] The information provided by Mr. Nordby was used during a *Daubert* challenge. Counsel said that, in retrospect, Dr. Nordby was "really pretty disappointing." He explained that he would give Mr. Nordby "a specific assignment," and then Mr. Nordby would "run off on his own and then send you a bill for it." Counsel agreed that the TBI DNA analyst claimed that the Petitioner's DNA was on both sides of the glove tip. The defense challenged that assertion, responding that there was insufficient DNA, only three alleles, on the outside of the glove. The TBI crime lab, however, said that the Petitioner could not be excluded as opposed to determining the results were inconclusive.

Counsel was provided with a complete copy of the Petitioner's and her mother's, Ms. Sanders, phone records. He confirmed that there was no indication that there was a phone call between the Petitioner and Ms. Sanders on the morning the murder was discovered. Counsel said that the records were consistent with Ms. Sanders's testimony at trial and her statements to Detective Putnam at the crime scene.

Counsel agreed that he did not object to the State's representation of the order of protection as acting to protect the children during opening argument. He agreed that the

---

[1] John Nordby's last name is spelled two ways in the records: (1) "Nordby"; and (2) "Nordeby." We are unclear as to the correct spelling but use the version from the post-conviction hearing transcript for consistency.

order of protection was for the victim only and that the Petitioner could still have contact with the children. He noted, however, his cross-examination of Lieutenant Pylkas where he extensively questioned him about the parameters of the order of protection and that it did not apply to contact with the children.

Post-conviction counsel questioned Counsel about instances where the Petitioner alleged Counsel failed to object to inadmissible evidence of the victim's "prior bad acts." One such allegation related to Sergeant Chick's testimony about finding shopping bags in the Petitioner's vehicle after the Petitioner's murder. Counsel agreed that, at trial, Sergeant Chick testified about items found in the cargo area of the Petitioner's vehicle. Counsel explained that he addressed this testimony during his cross-examination of Sergeant Chick. Counsel said that, through cross-examination, he was able to establish that the shopping bags contained home furnishings for the Petitioner's temporary apartment to make the apartment "a little bit more personal" for the children when they visited. These purchases, to benefit the children, had been agreed upon between the victim and the Petitioner prior to the victim's death.

Post-conviction counsel then questioned Counsel about Paul Breeding's testimony about the Petitioner's demeanor. Counsel responded that he did not recall the testimony and asked to see the transcript of the exchange. He noted that he believed Mr. Breeding had "little credibility" with the jury and that Mr. Breeding's testimony had been impeached by another State witness. Post-conviction counsel then withdrew his question regarding Mr. Breeding's testimony.

On cross-examination, Counsel testified that, before entering private practice, he worked as an assistant district attorney in Chattanooga and as an assistant U.S. attorney in both Florida and Nashville. Counsel confirmed that he had handled "dozens and dozens" of jury trials during his career. Counsel not only represented the Petitioner on the homicide charge but also on charges for evading arrest, reckless endangerment, three counts of violating an order of protection, and "a series" of harassing phone calls. He also made an appearance for her in a civil dispute and filed a motion on her behalf in probate court. In addition to his 112 meetings with her during his twenty-one month representation of the Petitioner, he also spoke with her almost daily by phone. He agreed that he spoke frequently with Ms. Sanders as well.

Counsel testified that he represented the Petitioner at a "much reduced legal fee" and believed both the Petitioner and Ms. Sanders were satisfied with his representation. Counsel referenced a letter dated May 2009 from Ms. Sanders thanking Counsel for his representation. About the allegation that he failed to demonstrate that the glove tip found at the crime scene was probably planted, Counsel testified that he had no information to support that the glove tip was planted. Counsel agreed that the Petitioner believed the

autopsy was a partial autopsy based upon her experience working at the medical examiner's office while a medical student. He shared Dr. Deering's autopsy report with a defense expert, Dr. John Arden, who agreed with Dr. Deering's cause of death.

Post-conviction counsel questioned Counsel about his decision not to introduce evidence of the victim's poor character. Counsel testified about the information he received from a private investigator, Ms. Holt, who was referred to him by the Petitioner's attorney in civil matters, Andrew Cate. Ms. Holt had interviewed a cab driver identified by the Petitioner and then met with Counsel to relay the cab driver's statements about the victim. Counsel said that his notes reflected that Ms. Holt conveyed to him concerns about the cab driver's credibility. When Counsel reviewed the cab driver's affidavit, "it sounded exactly like some of the things that [the Petitioner] had told me" just weeks before the Petitioner "stumbled upon" this cab driver. Ms. Holt also told Counsel that the victim might have sold drugs to Harpeth Hall students. Counsel stated that he had never heard allegations of the victim selling drugs to Harpeth Hall students. Counsel stated that he was unaware of any legal basis to enter evidence of alleged marital misconduct or sexual deviancy on the part of the victim.

Counsel confirmed that he hired two DNA experts, Lawrence Kobilinsky and John Nordby. Neither expert indicated there was any issue with chain of custody in the case. He agreed that one of the theories Mr. Kobilinsky posited was that there was a possibility the mixture found on the Petitioner's jeans could have been the Petitioner's blood and the victim's semen.

Upon further questioning by the post-conviction court about the box of latex gloves obtained at Walgreens the night of the murder, Counsel testified that the proof was that the Petitioner had the gloves and during a time frame that was not beneficial to the defense. The trial court had ruled that neither party could address the issue of whether the gloves were stolen and, thus, there was no proof presented at trial on whether the gloves were purchased, intentionally stolen, or inadvertently taken from the store.

Thomas Deering, the medical examiner who conducted the victim's autopsy, testified that he met with Counsel before trial. He denied telling Counsel that it was physically impossible for the Petitioner to strangle the victim. He said that he was presented with the scenario of a sixty inches tall, ninety-five pound woman committing the strangling. He responded that it was not impossible but improbable and not "typical." He said that once the "strangle with the ligature was established then it was certainly possible." Dr. Deering said that his testimony at trial was that there was tremendous force that caused the hyoid to press hard against the cervical spine and that there was bruising to the muscles on the back of the voice box, which would require "somebody very strong or a ligature applied strongly." Dr. Deering confirmed that the injuries

indicated that the victim struggled against the ligature. Dr. Deering testified that the autopsy revealed two aspirin in the victim's stomach.

Upon questioning by the post-conviction court, Dr. Deering testified that, in this case, he conducted "a full autopsy with toxicology." He said that he was unaware of any dispute about the cause of death in this case.

David Dingler, the victim's former business partner, testified that he first met the victim in March 1999. Clayton Associates, Mr. Dingler, and the victim began a "start-up" business together. Clayton Associates had forty percent ownership of this business, Mr. Dingler had forty percent, and the victim held twenty percent ownership. Mr. Dingler said that in January 2004, "me and [the victim] and Clayton Associates had a very large business divorce." During the course of the "business divorce," Mr. Dingler said that "certainly some of the character issues came out." He said that the victim could be truthful or "very untruthful" depending on the situation. He recalled that the victim was well-liked in the business community but that he "could have" had "enemies in the business."

Mr. Dingler recalled an incident where he and the victim were returning from a trip to Nashville and stopped at a liquor store. The victim came up to the register with a case of wine and Mr. Dingler noted that the victim did not drink wine. The victim responded that the wine was for the Petitioner. Mr. Dingler thought this was odd in light of the fact that the Petitioner had just been released from "rehab."

Mr. Dingler testified that he worked for a medical company who sold latex gloves for about twelve years "in the seventies." In his experience with latex gloves, he found that latex rips in a "saw tooth" pattern. He said that when he learned there was a latex glove tip recovered in this case, he found that "very incredible." He viewed the glove tip and noticed that the edging was straight like it had been cut rather than a saw tooth pattern if it had torn. Mr. Dingler admitted that he did not have any "knowledge" of Walgreens latex gloves specifically.

At this point in the hearing, the post-conviction counsel wanted to use Trial Exhibit 55, the box of Walgreens gloves found in the Petitioner's car, to demonstrate what a tear on a latex glove would look like. The post-conviction court denied the Petitioner's request to tear up a trial exhibit. The post-conviction court suggested that the Petitioner's attorney might want to purchase a box of Walgreens gloves if he wished to do a demonstration. The Petitioner's attorney responded that Walgreens stopped selling latex gloves in late 2012 or early 2013. The post-conviction court again denied the Petitioner's request to rip up five gloves from the trial exhibit. When Mr. Dingler offered to use some latex gloves he had brought from home, the State objected to the introduction

on the basis that Mr. Dingler's latex gloves were not the same type or brand of glove. The post-conviction court agreed with the State and denied the Petitioner's request to use a different type of latex glove for a live demonstration.

Mr. Dingler testified that it had been a long time since he had worked with latex gloves but, based upon his memory, there were various manufacturers for gloves that were sold under private labels. He guessed that there were "probably five or six in the world." He stated that he believed that all latex gloves were "very close to each other" in thickness and would all rip in the same fashion. The Petitioner's attorney then attempted to have Mr. Dingler compare how the latex gloves Mr. Dingler had brought from home compared with the feel of the latex tip found at the crime scene. The Petitioner's attorney explained that he was seeking a lay opinion from Mr. Dingler and the post-conviction judge on the textures of the two gloves. The post-conviction judge declined to provide a "lay opinion" on the "feel" of the two gloves. The Petitioner's attorney again sought to have Mr. Dingler rip the gloves he had brought from home to show whether the rip was "saw tooth." The post-conviction court allowed it, and Mr. Dingler ripped multiple finger tips from a glove. The Petitioner's attorney asked Mr. Dingler to rip ten tips of a glove and submitted them as evidence. As he was tearing the gloves, Mr. Dingler said that he would characterize the ease of which one can tear a latex glove as "hard." He said that most people removed a latex glove from their hand starting at the cuff not the fingers.

On cross-examination, Mr. Dingler testified that he was not present during the trial when Special Agent Linda Littlejohn, a TBI agent, testified about the latex gloves. He agreed that he never heard any testimony about how the glove tip became detached from the remainder of the glove. He agreed that latex gloves are easily cut with scissors or another sharp item. He stated that his degree is in business and his career has been in sales as a vendor.

Elliott Webb, an asset protection manager for Walgreens, testified that a UPC code is a universal product code assigned to merchandize. These codes allowed a business to track inventory. He confirmed that someone could look up surveillance video based upon the time an item was sold by Walgreens.

William Watson, an independent forensic consultant, testified as an expert in forensic DNA analysis and serology. Dr. Watson testified that a presumptive blood test indicated the possible presence of blood but there were other items that could cause a positive reaction from the test in addition to blood. Dr. Watson said that bacillus, E. coli, and salmonella can all render a false positive on a presumptive blood test. Additionally, plant extracts such as potatoes, tomatoes, kidney beans, horseradish, and milk could cause a false positive. He also mentioned gastric secretions released through vomiting,

35

"saliva in some instances," leather, "some types of soap," and paper. Finally, he mentioned chromium, magnesium, lead, and iron in "salt form can cause a false positive result." Dr. Watson said that the TBI performed two presumptive blood tests on the Petitioner's jeans in this case.

Dr. Watson testified that the DNA mixture found on the Petitioner's jeans and the positive presumptive blood test from the DNA mixture were not sufficient information to confirm the presence of blood on the jeans. He explained that items worn against the skin, such as jeans, can have DNA on the material without the presence of blood. According to the TBI report, there was a mixture of at least two persons' DNA on the jeans, and the balance of the DNA from the two contributors was "about equal." Dr. Watson said that the "equal mixture" was inconsistent with DNA transfer from touch (the Petitioner's DNA) mixed with DNA from a blood stain (the victim's DNA) because the DNA from the blood stain should be "significantly more." He said that, assuming the blood was from the victim, he would "expect to see a stronger contribution from the blood contributor." Given the quantity of the DNA found, Dr. Watson did not believe the stain was a mixture of blood and touch cells. Dr. Watson stated that another possible explanation for the DNA results is that the Petitioner's and the victim's biological children would share alleles from both parents. The result, therefore, may have been a mixture of the children's DNA on the Petitioner's clothing.

Janice D. Holt, a private investigator testified that she investigated a cab driver, Nathan Sterns, in connection with the Petitioner's case. Ms. Holt told Counsel about the content of her conversation with Mr. Sterns. She said that Mr. Sterns had driven the victim on several occasions to gay bars. Ms. Holt was also told by "several different people" that the victim gave the Petitioner prescription pills and "a lot of wine." There were also allegations that the victim provided drugs to Harpeth Hall students. Ms. Holt stated that she never conveyed to Counsel that she doubted the veracity of Mr. Stern's statements. Ms. Holt spoke with one of the victim's neighbors in an attempt to confirm Mr. Stern's assertions, and the neighbor's wife asked Ms. Holt to leave immediately.

On cross-examination, Ms. Holt testified that she first spoke with the Petitioner when the Petitioner suspected the victim was cheating on her. The Petitioner, however, never hired Ms. Holt to investigate; they only spoke on the phone twice. Mr. Cate later hired Ms. Holt related to the probate proceedings involving the Petitioner. Mr. Cate asked Ms. Holt to share the information she had found about the victim's sexuality with Counsel. She provided Counsel with the information, but Counsel never employed her.

Johnny Lawrence, a Metropolitan Nashville police officer at the time of the murder, testified that, at trial, he testified about stepping on a coat hanger that was on the closet floor "just beyond" the victim. Officer Lawrence explained that another officer

noted a stain on a box inside the closet that might be "a cast-off-blood stain." When Officer Lawrence moved closer for better inspection he stepped on a "dry cleaner type coat hanger." He did not realize until later that he left a boot imprint on the paper portion of the hanger. When asked about the specific time related to the collection of various evidence, Officer Lawrence said he could not recall.

On cross-examination, Officer Lawrence testified that he did not plant any evidence at the crime scene in an attempt to frame the Petitioner. He stated that he did not see any other officers plant evidence. He explained that once he cleared the upstairs, anyone who went upstairs would have been escorted by him.

The State called TBI Special Agent Jennifer Shipman as an expert witness in the field of forensic science. Agent Shipman was the original scientist who performed the DNA analysis related to this case. Special Agent Shipman confirmed that the TBI Crime Laboratory is ASCLD/LAB accredited which requires the laboratory to follow very rigid and specific procedures. Special Agent Shipman explained that her name was not included on the chain of evidence for the latex glove tip because she worked on the evidence with Linda Littlejohn, who was listed on the chain of custody, in the Microanalysis Unit. Because of this, the evidence was never "directly" in her possession. Special Agent Shipman stated that she was not aware of any contamination or alteration of the exhibit.

Upon questioning by the post-conviction court, Special Agent Shipman testified that she did not find any documentation of contamination in the file for this case. She further explained that, if there was contamination, the TBI was obligated to document and notify the parties.

After hearing the evidence, the trial court issued an order denying relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner contends that: (1) Counsel was ineffective; (2) the post-conviction court erred by "refusing to inspect, or allow inspection of, physical evidence;" and (3) the search warrants used to obtain the Petitioner's DNA and clothing lacked probable cause and specificity. The State asks us to affirm the post-conviction court's denial of relief.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual

allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn.1999) (*citing Henley v. State*, 960 S.W.2d 572, 578–79 (Tenn.1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id*. at 457.

## A. Ineffective Assistance of Counsel

The Petitioner alleges numerous deficiencies in Counsel's representation of the Petitioner, including: (1) Counsel's failure to challenge the search warrants based upon claims of lack of specificity and lack of probable cause; (2) "generally botching the DNA and serology evidence;" (3) Counsel's failure to pursue a defense based upon the theory that the glove tip was planted; (4) assertions made in opening argument that were later unsupported by the proof; (5) Counsel's failure to "use" exculpatory evidence in the form of phone calls and a "suspicious" footprint found near the victim's body; (6) inadequate cross-examination of I.C. about his prior inconsistent statements; (7) inadequate defense of the Petitioner's character; and (8) Counsel's failure to "impeach the victim as a hearsay declarant."

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

39

Following the hearing, the post-conviction court issued a lengthy and detailed order explaining its reasoning in denying the Petitioner relief. At the conclusion of the order, the post-conviction court summarized the Petitioner's complaints with regard to ineffective assistance of counsel and its findings:

> A review of the post-conviction testimony and exhibits introduced over the course of the four hearings as well as the trial record itself shows that Trial Counsel conscientiously and effectively represented his client. The vast majority of claims raised by Post-Conviction Counsel concern difference in litigation styles and cross-examination strategies, which does not constitute ineffective assistance of counsel, warranting post-conviction relief.

The State in its brief also summarizes the crux of the Petitioner's arguments on ineffective assistance of counsel as follows:

> The petitioner articulates an extraordinary number of ways in which she would have handled each ground differently from trial counsel. Mere disagreements with counsel's choices do not however, constitute deficiency.

We agree. After a thorough review of the record, we find no deficient performance on the part of Counsel. To the contrary, the record reveals that Counsel was thorough, conscientious, his trial strategies reasonable, and his decisions informed. The fact that the Petitioner was convicted at trial is not an indication of deficiency in Counsel's representation but rather a reflection of the weight of the State's evidence against the Petitioner. We conclude that Counsel's services were well within the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Nonetheless, we specifically address each of the Petitioner's issues in turn.

### 1. Motions to Suppress

The Petitioner asserts that Counsel's decision to file a motion to suppress the Petitioner's statements to police rather than attacking the search warrants constitutes deficient performance. The State responds that Counsel's decision to forego filing motions to suppress the search warrant seeking the Petitioner's jeans and her DNA sample was a strategic decision based on extensive preparation and research; thus, the trial court properly denied relief. We agree with the State.

At the post-conviction hearing, Counsel testified that the basis for the warrants used to search the Petitioner's apartment and to obtain her DNA came from her statements to the police. The probable cause provided in support of the search warrant states:

> [The Petitioner] told detectives that the clothing she was wearing was what she had on when she went to [the marital] residence. [The Petitioner] later told detectives she was wearing other clothing when she went to the [marital] residence. [The Petitioner] pointed to several pieces of clothing and initially consented to let detectives collect the clothing. [The Petitioner] then revoked consent before all the clothing could be collected.

The search warrant sought to recover "clothing used in the Homicide." The Petitioner's statements to police about being inside the residence the night of the murder and specifically what she wore at that time were used in seeking a search warrant to obtain her DNA.

In its order denying relief, the post-conviction court made the following findings:

> Trial Counsel testified that he does not believe the warrants were overbroad on their face; thus, he felt the better approach was to suppress Petitioner's statements and he filed a motion to do so. Specifically, on January 9, 2009, Trial Counsel filed a "Motion to Suppress Statements Made by Kelley Cannon to Metro Police on June 23, 2008", which moved to suppress: (1) any statements Petitioner made during the two police interviews on June 23, 2008, (2) all testimony of law enforcement agents relating to their observations while recording and documenting said statements, and (3) any evidence that was the result of the investigator leads obtained as a result of said statements. The Court held a hearing on the motion to suppress statements as well as other evidentiary motions on July 8, 2009. See Ex. 5.

> Trial Counsel testified about his legal tactic, explaining that since the police used Petitioner's statements as probable cause in their warrant, he also requested the suppression of any investigatory leads thereof; thus, had the suppression motion been granted, the clothes would have suppressed as well. Trial Counsel stated, "I believe it was the more effective way to seek suppression of items." The Court finds Trial Counsel's testimony credible. Trial Counsel's strategic decision did not fall below the objective standards of reasonable counsel. Accordingly, Petitioner has failed to demonstrate by

41

clear and convincing evidence that Trial Counsel was ineffective for not filing an alternative suppression motion.

We agree with the post-conviction court that Counsel's performance was not deficient in this respect. As we earlier stated, Counsel should not be deemed to have been ineffective merely because a different strategy, now in hindsight, may appear to be preferable. *Williams*, 599 S.W.2d at 279-80. The Petitioner is not entitled to relief as to this issue.

We note that the Petitioner relies on *State v. Meeks*, 867 S.W.2d 361 (Tenn. Crim. App. 1993), in asserting that Counsel was deficient. In *Meeks*, a search warrant was issued for the defendants' residence and directed the search for and seizure of "evidence of said armed robbery or robberies." *Id.* at 372. The Court found that more particular descriptions of the stolen items could have been obtained from the victims and should have been included in the warrant to distinguish the victims' property from the defendants' similar property lawfully possessed. Without more particular descriptions, the executing officers were left free to seize innumerable items regardless of their actual relationship to the robbery. In the instant case, the officers were searching the Petitioner's residence for the Petitioner's belongings that she had physically identified for the police. In our view, the warrant describes the character of the property subject to seizure with sufficient particularity "to enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *See also, State v. Meadows*, 745 S.W.2d 886, 891 (Tenn.Crim.App.1987).

Accordingly, we conclude that the Petitioner has failed to show that Counsel was deficient in this respect.

## 2. DNA and Serology Evidence

The Petitioner argues that Counsel was ineffective for "bungl[ing]" the scientific evidence related to the blood on the victim's jeans. Generally, she attacks Counsel's representation in two respects: first, she challenges Counsel's use of expert advice and, second, she challenges his cross-examination of Special Agent Shipman. The State responds that Counsel's consultation with two experts who informed his decisions about trial preparation and presentation entitles his strategy to deference. We agree with the State.

The post-conviction court made the following findings:

42

The Court finds Trial Counsel's testimony credible. Although Trial Counsel did not present an expert witness at trial, he sought expert services. Due to the evidence of the case, however, the experts' opinions did not differ significantly from the State's own experts to justify calling them at trial. Trial Counsel, therefore, made the strategic decision to point out deficiencies in the State's case by cross-examining the State's experts with the knowledge he gleaned from consulting with the retained defense experts. The trial record reflects that Trial Counsel addressed the DNA evidence throughout the trial, including in his opening statement, his cross-examination of the State's expert, and during closing argument. For example, during the cross-examination of TBI Agent Shipman, Trial Counsel explored: (1) DNA testing revealed four unknown females in the results; (2) jeans identified by TBI as 4a with a mix of DNA and blood could be a result of DNA and other bodily fluids like urine or semen; (3) threshold peaks and when insufficient; and (4) the concept of transference and the Locard Exchange Principle.

Based on the above, the Court finds that Petitioner has failed to establish by clear and convincing evidence that Trial Counsel's performance fell below the standard of a reasonable attorney.

As to the Petitioner's challenge of Counsel's use of expert advice, she specifically attacks his failure to call a DNA expert for the defense and his failure to request "electronic raw data." At the post-conviction hearing, Counsel testified that he flew to New York, at his own expense, to meet with Dr. Kobilinsky, a man Counsel described as one of the foremost experts in DNA in the United States. Dr. Kobilinsky requested certain items in order to review the case and, pursuant to this request, Counsel provided Dr. Kobilinsky with the requested items: the TBI lab reports, bench notes, and the TBI manual. After review of this information and detailed discussions with Counsel, Dr. Kobilinsky felt that the TBI "did what [they were] supposed to do," and he did not believe his testimony would benefit the Petitioner. Dr. Kobilinsky did, however, help prepare Counsel for the cross-examination of the State's expert.

Additionally, Counsel employed John Nordby to assist with his preparation for the evidence regarding the glove tip introduced at trial. Although Mr. Nordby was not as beneficial an expert as Counsel might have hoped, he helped develop the strategy that the Petitioner's DNA would naturally be found in her former home, including on latex gloves that she used for a variety of household purposes. Counsel further acknowledged the Petitioner's strong background in science and her input regarding decisions about the DNA evidence. This evidence indicates that Counsel made a studied strategic decision not to call a DNA expert. Counsel sought qualified experts in the field, provided them

43

with the requested items they needed to evaluate the case, and then made trial decisions based on their advice and guidance.

Next, the Petitioner asserts that Counsel failed to object when Special Agent Shipman referenced the stain on the Petitioner's jeans as blood when only a presumptive blood test had been performed. She also argues that Counsel should have challenged the chain of custody and alleged contamination of the jeans. In addition to the above quoted references to Counsel's cross-examination of Special Agent Shipman, the post-conviction court made the following findings:

> When Trial Counsel was asked why he did not call an expert to testify that preliminary tests for blood do not mean an item[] has tested positively for blood, he responded there was no need for an expert to make this obvious point to the jury; further, it was an issue that he addressed through cross-examination. As to Petitioner's jeans specifically, identified by the TBI as 4C in their reports, Trial Counsel testified that based on his discussions with Dr. Koblinsky he asked questions to obliquely reference that the State did not know what biological materials were present on the jeans – blood, semen, urine, etc. – to "blunt the force that they did not know it was blood on the jeans." Trial Counsel stated he pursued this strategy under the guidance of an expert and felt it was the best way to deal with the scenario by characterizing it as something other than blood. The Court credits Trial Counsel's testimony and finds his actions demonstrated a reasonable trial strategy based on the evidence.

Counsel testified about his extensive research and employment of experts on DNA analysis. Following their advice, he employed the strategy of undermining the State's evidence about the certainty of the substance on the Petitioner's jeans being blood. He did not directly object to Special Agent Shipman's reference to blood but on cross-examination, elicited responses that presented to the jury, through the State's witness, the possibility that the substance might be something other than blood.

As to the assertion that Counsel should have challenged the testing on the basis of chain of custody and contamination, there is nothing in the record that would have supported these allegations. In his review, Dr. Kobilinsky did not identify any issues involving the contamination or the chain of custody of the DNA evidence upon which Counsel could have challenged the test results. The Petitioner's witness, at the post-conviction hearing, Dr. Watson, likewise could identify no specific indication of contamination. Agent Shipman confirmed that there was no documentation, as is required, of contamination and confirmed the accuracy of the chain of custody documents accompanying the evidence.

Accordingly, we conclude that the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient in his preparation and strategy for the DNA evidence in this case. To the contrary, the record shows that Counsel was thorough in his preparation and his decisions regarding strategy were well-informed. The Petitioner is not entitled to relief as to this issue.

### 3. Theory of Planted Evidence

The Petitioner contends that Counsel was ineffective for failing to introduce evidence that the glove tip found near the victim's body was planted and by failing to introduce a photograph of Walgreens brand latex gloves present at the crime scene. The State responds that the post-conviction court correctly found that Counsel's strategy was reasonable. We agree with the State.

About Counsel's failure to present a theory that the glove tip was planted, the post-conviction court found:

> Other than blanket assertions and speculations, Petitioner has provided no proof demonstrating any evidence was planted in this case, by law enforcement or civilians. Even the post-conviction petition uses hedging language alleging that "the single glove tip found at the crime scene was probably planted.
>
> . . . .
>
> As to whether Trial Counsel considered arguing to the jury that gloves were planted Trial Counsel responded that he did not say that anything was planted, rather his argument to the jury is that the State failed to present a coherent story and insinuate "there was a lot of confusion under which the glove tip was found and conclusions can be drawn." In short, Counsel's position was not that the scene was compromised by the police, but that he raised questions regarding how the evidence was collected. The Court finds Trial Counsel credible and his strategic decision based on reasonable investigation.

(citations to the record omitted).

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that, at the preliminary hearing, he questioned Detective Putnam about the gloves found in the back yard and Detective Putnam's unsubstantiated suspicion that

45

the gloves found outside of the house might have been planted. Both Detective Putnam and Detective Lawrence testified that they did not, nor did they see anyone else, tamper with evidence at the crime scene. According to the record, the glove tip was found near the victim's body in the bedroom and had both the victim's and the Petitioner's DNA on it. Counsel's trial strategy, developed in conjunction with an expert, was to show, as an explanation for her DNA on the glove tip, that the Petitioner, as a former resident, used latex gloves for a variety of household uses. Counsel also emphasized evidence in support of this theory that the crime scene was compromised, thereby allowing for inadvertent transference. The Petitioner also asserts that Counsel should have presented proof that the glove was cut rather than torn to establish that the glove was planted and not left behind by the Petitioner. In light of the evidence, we conclude that Counsel's strategy was reasonable and informed.

As to the Petitioner's assertion that Counsel should have presented a defense that "the killer," rather than the police, planted the glove tip, there is no evidence in the record to support that there was a third party involved in the victim's murder. It was the Petitioner's DNA on the glove tip, the Petitioner's fingerprint on the closet door frame, and the Petitioner's fingerprints on the partially opened window in the house.

The Petitioner also faults Counsel for failing to introduce a photograph of a box of Walgreens latex gloves found inside the victim's home. Counsel testified that part of his trial strategy was to show that latex gloves were routinely used in the home by the Petitioner. At trial, police records were introduced indicating the multiple locations that latex gloves were found inside the residence. Although the photograph of a box of Walgreens latex gloves found in the master bedroom was not introduced at trial, the jury was presented with evidence that latex gloves could be readily found inside the residence.

Accordingly, the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient and that she was prejudiced by such deficiency. The Petitioner is not entitled to relief as to this issue.

### 4. False Promises in Opening Argument

The Petitioner asserts that Counsel was ineffective for making two "promises" to the jury in opening argument that were not supported by the proof presented at trial. She alleges that he "promised to show that it was physically impossible for [the Petitioner] to have killed the victim" and that he "promised" the State's medical examiner would agree that "the Petitioner was innocent." The State responds that the Petitioner has failed to overcome the presumption that Counsel exercised reasonable judgment. We agree with the State.

The right to make an opening statement is protected by statute, which states that "all parties to the action shall have the right prior to the presentation of any evidence in the case to make an opening statement to the court and jury setting forth their respective contentions, views of the facts and theories of the lawsuit." T.C.A. § 20-9-301(2012). Opening statements are not evidence but simply set forth the arguments and theories which will be relied on by the parties at trial. *State v. Van Tran*, 864 S.W.2d 465, 475 (Tenn. 1993). They are "'are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.'" *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012), as corrected (Tenn. Oct. 10, 2012) (quoting *State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001) *superseded by statute as stated in State v. Odom*, 137 S.W.3d 572, 580-81 (Tenn. 2004)). Opening argument, like closing argument, must be predicated on evidence introduced at trial and should only refer to admissible evidence. *Sexton*, 368 S.W.3d at 415. Opening statements may not be used "to present speculation and conjecture which is unsupported by admissible proof." *Stout*, 46 S.W.3d at 713.

The post-conviction court first reviewed Counsel's opening statements and concluded that Counsel had discussed physical impossibility as one of the reasonable hypotheses in the case. The court noted that Counsel's summary of the testimony was substantially consistent with the actual evidence presented at trial. The post-conviction court found:

> Accordingly, based on a review of the trial transcript alone, the Court finds that Petitioner has failed to demonstrate that Trial Counsel failed to follow through with the defense set forth in the opening statement. She has not demonstrated by clear and convincing evidence that Trial Counsel gave any "false promises" to the jury. Nonetheless, the Court heard testimony from Trial Counsel on this issue at the post-conviction hearing.

> Specifically, Trial Counsel agreed that physically impossibility formed a substantial part of the defense strategy and was "the largest piece of the defense." Trial Counsel acknowledged that during his opening statement he informed the jurors that State's witness, Dr. Deering, would say it takes a powerful person to have strangled [the victim]. Trial Counsel explained he based the remarks in his opening statement on the "many meetings" he had with Dr. Deering. Trial Counsel detailed a meeting in January 2010, where he brought retired police officer Ricky Roll with him and they went over "expansively" all of the autopsy photographs with Dr. Deering. Trial Counsel testified that, "Any representations I made to the

47

jury were from the meetings Mr. Roll and I had with [Dr. Deering] as well as follow up phone calls."

Trial Counsel agreed that Dr. Deering's trial testimony was not "quite as strong" as when Trial Counsel interviewed him, citing that Trial Counsel was "not the most recent person" to talk to Dr. Deering as the State had spoken with Dr. Deering last. When asked why Trial Counsel did not call Mr. Roll as a witness to impeach Dr. Deering, Trial Counsel responded that he did not feel Dr. Deering changed his testimony to the degree to warrant calling Mr. Roll for impeachment purposes; further, while Mr. Roll was present at the meeting, Trial Counsel testified that he was the one who conducted the interview and served as the scrivener; he did not believe Mr. Roll could recall all of the statements Dr. Deering made during the 3-4 hour interview since Mr. Roll's primary purpose in being there was to make copies of all the photographs.

A large portion of Trial Counsel's post-conviction testimony involved reiterating the specific details of the conclusions made by Dr. Deering and Dr. Arden (which mirror the doctors' respective testimony in the trial transcript) as well as the contents of his discussions with both experts and his notes summarizing said discussions, which were admitted as Exhibits 7 and 8. Although the Court found the record disproved Petitioner's allegation, the Court finds Trial Counsel's testimony to be credible and related to a reasonable trial strategy based on the circumstances; thus, no post-conviction relief is warranted. Petitioner has failed to demonstrate by clear and convincing evidence that Trial Counsel was ineffective or that she was prejudiced by the alleged ineffectiveness.

(footnotes omitted).

The evidence does not preponderate against the trial court's findings. We have reviewed Counsel's opening arguments and discern no "promises" made to the jury. Counsel introduced the theory of physical impossibility during opening argument consistent with his trial strategy that the victim's size and physical state at the time of the murder was not consistent with the State's theory of how the murder occurred. Counsel then described Dr. Deering's projected testimony, which was consistent with his actual testimony describing the "remarkable" nature of this strangulation case that he had only seen "very rarely" in other autopsies. Dr. Deering described the injuries the victim sustained as a result of a struggle and the "moderate to large amount of force" applied to the victim's neck. Counsel also introduced other witnesses who testified to the Petitioner's compromised state at that time due to alcohol and health-related issues in support of the defense theory of physical impossibility.

48

In our review of the opening argument, we identify no statement promising Dr. Deering would agree that the Petitioner is innocent. Counsel did state, "And I think [Dr. Deering] is going to tell you, ladies and gentlemen, that the strangulation in this case was accomplished with so much force that it had to be somebody who was extremely powerful to have done it." At the post-conviction hearing, Counsel explained that this statement was consistent with his pre-trial discussions with Dr. Deering but that by the time of trial, Dr. Deering's testimony was not "quite as strong." Counsel reasonably relied on his discussions with Dr. Deering and his opening argument is a reflection of his interview of Dr. Deering. Further, although Dr. Deering's testimony was not as strong as Counsel anticipated, it remained substantially consistent with Counsel's summary in the opening argument. Counsel's statements were neither speculative or conjecture, rather the statements were based upon his extensive discussions with Dr. Deering.

Accordingly, we conclude that the Petitioner has not proven that Counsel was ineffective in this respect; thus, she is not entitled to relief as to this issue.

### 5. Failure to Use Exculpatory Evidence

The Petitioner alleges that Counsel failed to use exculpatory evidence. Specifically, she challenges his use of cell phone records for the limited purpose of showing that the victim frequently called the Petitioner in the weeks leading up to the murder rather than showing that the Petitioner attempted to call the victim after he was dead in support of her innocence. Further, she asserts that Counsel should have used phone records to show that the Petitioner never called her mother on the day of the discovery of the victim's death to rebut proof that she allegedly called her mother and confessed. The Petitioner also argues that Counsel failed to "use" the "suspicious footprint" found next to the victim's body as exculpatory evidence.

### a. Phone Records

About the Petitioner's allegation that Counsel was ineffective in his use of the phone records, the post-conviction court made the following findings:

> Trial Counsel explained that the portion of calls he had highlighted for the jury stopped at June 22, 2010, at 10:38 p.m., to show that prior to [the victim]'s death there were forty-six calls between the Petitioner and [the victim], with thirty-five calls initiated by [the victim], and eleven calls initiated by Petitioner. When questioned why he did not highlight the post-death call, Trial Counsel responded that while one construction of the post-death call is that Petitioner was unaware [the victim] was dead, the other is

49

the State using it against Petitioner to claim she was creating an alibi, which was the State's characterization for Petitioner's dinner at Bricktop's restaurant.

Trial Counsel testified that he consulted with Petitioner, and together they determined which calls were relevant to highlight for the jury. The Court finds Trial Counsel's testimony credible and that Trial Counsel made a reasonable strategic decision based on thorough investigation. Moreover, although the post-death call was not highlighted in the trial exhibit, Trial Counsel still brought said call to the jury's attention during his cross-examination of Detective Putnam. Petitioner, therefore, has not established by clear and convincing evidence that Trial Counsel was ineffective nor has she established that she was prejudiced by the alleged deficiency.

The evidence does not preponderate against the post-conviction court's findings. Counsel's decisions about the use of the phone records were informed. He considered the possible negative implications of emphasizing the "post-death" phone call, and, after consultation with the Petitioner, made the strategic decision not to highlight the call on the phone record.

The Petitioner also alleges that Counsel failed to rebut the Petitioner's "alleged confession" to her mother by introducing the victim's phone records indicating she had not spoken with her mother on her cell phone on the morning of June 23, 2008. In support of her contention that the State alleged at trial that she "confessed" to her mother, the Petitioner refers to this Court's order denying her petition to rehear, in which we refer to Ms. Sander's "bizarre testimony." This Court's order is not proof that at trial there was an allegation that the Petitioner confessed to her mother. In the second amended petition, the Petitioner cites to a portion of the transcript that contains the housekeeper's testimony. The housekeeper, Vickie Shams, testified that she called the Petitioner's mother and "was shocked" by her response to the news that the victim was dead. Ms. Shams said that Ms. Sanders's response to hearing this news indicated that she already knew the victim was dead.

In its order denying relief on this issue, the post-conviction court stated, "at no time during the trial was it said that Petitioner called [and] confessed to Ms. Sanders." The Petitioner identifies no portion of the trial transcript indicating a confession and, like the post-conviction court, we find no portion of the record in support of this contention. Any inference that may be taken from Ms. Shams's testimony was clarified by Ms. Sanders's testimony. Ms. Sanders testified that she first learned of the victim's death from Ms. Shams. Ms. Sanders stated that she did not speak with the Petitioner on the morning she learned of the victim's death. She said that she and the Petitioner were

"somewhat estranged" and that she did not know the Petitioner's cell phone number. Furthermore, the phone records, showing that the Petitioner did not call or receive a call from her mother, were introduced at trial.

Accordingly, we conclude that the Petitioner has not shown by clear and convincing evidence that Counsel was deficient in how he used the Petitioner's phone records at trial. The Petitioner is not entitled to relief as to this issue.

### b. Shoe Print

The Petitioner asserts that Counsel was ineffective for not "using the suspicious footprint found next to the body." The State responds that the proof at trial and the post-conviction hearing was that the shoeprint belonged to Officer Johnny Lawrence. As to this issue, the trial court made the following findings:

> Officer Johnny Lawrence testified at the post-conviction hearing about this issue. He explained that during the investigation he was training Investigator Primm. While they were in the boys' bedroom investigating the closet where the body had been found, they observed some stains that appeared to be "cast-off bloodstain." Officer Lawrence testified he was unable to obtain a clear view from outside the closet, so he "took two steps in", stepping on a "drycleaner type hanger with paper on it." Officer Lawrence testified he knew he stepped on the hanger because of the sound he heard, but at the time he stepped on it, he did not realize he had left a boot print.

> Photographs of the hanger were taken as part of the crime scene process. When the boot print was brought to Officer Lawrence's attention later by Detective Putnam, Officer Lawrence recognized the treads as matching his work boots. Officer Lawrence testified at trial about the hanger, and, the trial record reflects the photographs of the closet showing the hanger were [sic] admitted at trial as exhibit 16A and 16B.

> Officer Lawrence denied planting any evidence to frame Petitioner for the murder of [the victim], adding that he did not even know [the Petitioner]. Officer Lawrence did not observe any other officers plant evidence.

> Trial Counsel was not specifically asked about this issue during his post-conviction testimony.

(Citation to the record omitted).

The evidence does not preponderate against the post-conviction court's findings. Officer Lawrence testified about stepping on the hanger, specifically noting it at the time, but not realizing he had left a boot print until he saw a photograph of the boot print. Officer Lawrence identified the print as matching the tread of his boots, and he confirmed that he had stepped on the hanger, causing the boot print. Aside from the Petitioner's bare assertion that the boot print belonged to "the killer," there is no evidence to support the identity of another person having left the boot print. Accordingly, we find no deficiency on Counsel's part with respect to the boot print. The Petitioner is not entitled to relief as to this issue.

## 6. Cross-Examination of I.C.

The Petitioner asserts that Counsel was ineffective for failing to properly cross-examine I.C. about his inconsistent statements made during a forensic interview. At trial, two years after the murder, I.C. testified that, on the night of the murder when the Petitioner awoke I.C. in the middle of the night to take him to her apartment, I.C. asked the Petitioner if he could retrieve a pillow from his bedroom, and she told him no. He said that he exited the upstairs with the Petitioner down the front stairs rather than the rear stairs located near his bedroom. Near the time of the murder, a victim witness coordinator with the District Attorney's office conducted a forensic interview with I.C. In this interview, I.C. said he exited the upstairs by way of the rear stairwell and, as he passed his bedroom, observed a couch pushed against the closet door. By the time of trial, I.C. had no recollection of this statement or seeing the couch.

The post-conviction court found:

> The Court finds Trial Counsel's testimony credible and that Trial Counsel made a reasonably based strategic decision.

> The fact that Post-Conviction Counsel disagrees with the tactic and would have pursued an alternative strategy – i.e., "The moment that [I.C.] took the stand against his mother, trial counsel had a sacred duty to destroy him." -- does not undermine the validity of the strategic decision employed by Trial Counsel. The Court of Criminal Appeals has "acknowledge[d] the unique difficulty of cross-examining a child at trial" and Trial Counsel's cross-examination demonstrated he was prepared and aware of the child's previous statements. Jimmy Greene v. State, No. E2000-00426-CCA-R3-PC, 2001 WL 237343, at *10 (Tenn. Crim. App., at Knoxville, Mar.6, 2001). The Court finds that Trial Counsel's decision was reasonably based.

(Citations omitted).

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that the Petitioner was "devastated" that her young son had to testify at trial and wanted him "off the stand" as soon as possible. Neither Counsel nor the State believed I.C. to be a crucial witness. Counsel was aware of the forensic interview and had reviewed it. As such, he was aware of the inconsistent statements, as well as statements I.C. made that were damaging to the Petitioner; therefore, he chose not to play the recording at trial. Counsel believed it was "cleaner" to cross-examine Detective Putnam about I.C.'s inconsistent statement, and he did so. Through Counsel's cross-examination, Detective Putnam acknowledged that, during the forensic interview, I.C. had said he saw a couch pushed against the closet. This evidence supports that Counsel had a strategic plan for handling I.C.'s inconsistent statements. This Court has previously held that a petitioner is not entitled to, with the benefit of hindsight, second-guess an attorney's reasonably based trial strategy and criticize a sound but unsuccessful tactic. *Dellinger v. State,* 279 S.W.3d 282, 295 (Tenn. Jan. 2009) (*citing Thompson v. State*, 958 S.W.2d 156, 162 (Tenn. Crim. App. 1997). We conclude that the Petitioner has failed to show that Counsel was ineffective in his cross-examination of I.C.

The Petitioner also asserts that Counsel should have called F.C., I.C.'s younger brother, to rebut I.C.'s statements. At the post-conviction hearing when Counsel was asked why he did not call the younger sibling to testify, Counsel responded, "I'm not in the business of calling small children and hoping they're going to carry the water for me as a witness." Counsel testified that his strategy was to address the inconsistent statements through Detective Putnam, and he did so. We find no deficiency in this strategy.

### 7. The Admission of Prior Bad Acts

The Petitioner argues that Counsel was ineffective for "not defending against a wide variety of inflammatory accusations." The State responds that the Petitioner is not challenging the absence of a strategy but rather is disagreeing with Counsel's strategy; because Counsel's strategy was based on informed preparation, the Petitioner has failed to prove deficient performance by clear and convincing evidence. We agree with the State.

### a. I.C.'s Testimony About the Use of a Knife

The Petitioner asserts that Counsel was ineffective for failing to challenge I.C.'s "accusation" that the Petitioner "fought the victim while wielding a knife." I.C. testified:

"[The victim] went outside with his phone, and my mom came out with a knife, pushed him down trying to undo his phone battery so he couldn't call the police, like pushed him down onto the ground. He was like fighting trying to get her off. And she was trying to undo the battery from his phone."

At the post-conviction hearing, Counsel disagreed with the characterization that I.C. testified he "saw [the Petitioner] standing over [the victim] wielding a knife." Counsel testified that I.C.'s account was "exactly" what the Petitioner had told him about the incident that "the only reason she had the knife" was to remove a battery from the victim's phone. As the Petitioner points out, the victim's petition seeking an order of protection makes no mention of a knife used in the assault, the police do not document the Petitioner "wielding" a knife, the 911 tape indicates no use of a weapon, and the Petitioner was not charged with a crime for committing an assault with a deadly weapon. Because this was not an allegation presented at trial, Counsel could not have been expected to challenge such an "accusation." The Petitioner is not entitled to relief as to this issue.

### b. Walgreen's Latex Gloves

The Petitioner asserts that Counsel was ineffective for failing to challenge the allegations that the Petitioner stole gloves from Walgreens. The State responds that this allegation is not supported by the record.

According to the post-conviction court, it ruled on a pre-trial motion that neither party could use the term "shoplift" at trial but that the State could argue that the video surveillance footage did not show the Petitioner paying for the gloves. The Petitioner does not cite to and we find no testimony in the record that the Petitioner stole or shoplifted the gloves. At the post-conviction hearing, Counsel testified that the Petitioner is seen on the surveillance video footage leaving the store with the gloves but is not shown paying for the gloves. The Petitioner denied intentionally stealing the gloves to Counsel but there remained the possibility that she walked off inadvertently without paying for them. Counsel's investigator found no proof that the Petitioner purchased the box of latex gloves. Counsel was limited by the trial court's ruling and the surveillance footage. The Petitioner has failed to show that Counsel was ineffective in this regard.

To the extent that the Petitioner attacks Counsel for allowing the trial court to instruct the jury on how to consider the evidence, the purpose of a limiting instruction is to protect the defendant. Counsel's failure to object to the trial court instructing the jury to only consider the evidence for the intended purpose does not constitute a deficiency.

Finally, the Petitioner accuses Counsel of failing to furnish documentation of her purchase; however, on post-conviction, the Petitioner has not furnished the documentation for which she criticizes Counsel for failing to provide. Therefore, she has failed to prove her allegation by clear and convincing evidence. The Petitioner is not entitled to relief as to this issue.

### c. Violation of the Order of Protection

The Petitioner claims that Counsel was deficient for allowing testimony at trial that the Petitioner was arrested for violating an order of protection that forbid contact with her children. The State responds that the Petitioner has failed to show how Counsel's strategy concerning the order of protection caused her prejudice.

The post-conviction court made the following findings:

Trial Counsel testified that he represented Petitioner on several of her cases. He explained the order of protection violations were charged under a different case number, 2008-D-3864. He stated he had been successful at dismissing the charges in General Sessions, but the State decided to indict. The 2008-D-3864 case tracked case no. 2008-C-2809, which the State tried first. Once Petitioner was convicted on the murder charge, the State elected not to proceed with case no. 2008-D-3864.

Trial Counsel explained that the order of protection may have been valid as to [the victim] but not valid as to Petitioner's children. Trial Counsel noted the language about the children in the orders, but "seized up on it in both motions" because his reading of the statute did not preclude Petitioner from having contact with her children.

Post-Conviction Counsel inquired why Trial Counsel did not object when the State referenced the order in its opening statement, directing Trial Counsel to page 20 of the [trial] transcript. Trial Counsel pointed out that the State was referring to the incident of May 21, 2008, which prompted [the victim] to seek an order of protection for him and his children. Trial Counsel testified that the State's opening statement was partially accurate because Petitioner was not to be at the house at Bowling Avenue, but Trial Counsel elected not to make a contemporaneous objection at that time even though Petitioner was still permitted to see her children. Instead, [he] addressed the issue through the questioning of witnesses at trial.

When Post-Conviction Counsel asked why Trial Counsel did not object during Mr. Hollins's testimony about the order of protection, Trial Counsel pointed out that he did raise an objection, which the Court sustained. The trial record supports Trial Counsel's testimony.

When Post-Conviction Counsel asked why Trial Counsel did not object when Officer Pylkas misstated that Petitioner had her children when there was an order of protection preventing her from doing so, Trial Counsel explained that (1) the transcript reflects that Officer Pylkas's testimony to the State's question was ambiguous and the officer did not "pick up on [the ADA's] language regarding the children", and (2) Trial Counsel addressed the issue on cross-examination. Trial Counsel further testified that he pursues a mindful litigation strategy where he opts to address issues through cross-examination rather than "constantly jumping up" making objections. The Court credits Trial Counsel's testimony and finds that the trial record supports Trial Counsel's post-conviction testimony. Petitioner's request for post-conviction relief is denied as to this claim as Petitioner has not demonstrated by clear and convincing evidence that Trial Counsel was ineffective or that she was prejudiced by any alleged deficiency.

(Citations to the record omitted).

The evidence does not preponderate against the trial court's findings. As we earlier stated, a petitioner is not entitled to, with the benefit of hindsight, second-guess an attorney's reasonably based trial strategy and criticize a sound but unsuccessful tactic. *Dellinger,* 279 S.W.3d at 295. Counsel's strategy with addressing issues regarding the scope of the order of protection was informed and based upon adequate preparation. We conclude that the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient as to this issue.

### d. "Callousness"

The Petitioner asserts that Counsel was ineffective because he lodged no objection to the allegations that the Petitioner exhibited "emotional callousness" regarding the victim's death. She identifies the State's reference during closing argument to the Petitioner's "shopping spree" following the victim's death, and Mr. Breeden's testimony that the Petitioner sounded unemotional when describing the victim's death. The State responds that the Petitioner has failed to prove her allegation by clear and convincing evidence.

56

In its order denying relief, the post-conviction court found:

> Trial Counsel testified about the shopping bags and how the "shopping spree" had been addressed at trial: Petitioner recently had moved to her own apartment and had purchased furnishings for the apartment. Counsel's decision constituted a trial strategy tactic as to how he approached the State's evidence against his client.

> Trial Counsel testified that Paul Breeding had little credibility and was impeached by the State's own witness, Rick Green. When Post-Conviction Counsel [asked] why he did not object during the State's questioning of Mr. Breeding, Trial Counsel responded he would need to see his cross-examination to provide an explanation. Post-Conviction Counsel then withdrew the question, waiving any issues as to the Trial Counsel's handling of Mr. Breeding's testimony.

The evidence does not preponderate against the trial court's findings. The Petitioner is not entitled to relief.

### e. "Orders of Protection, Domestic Assault, being "Psychotic," on Drugs"

The Petitioner finally asserts that Counsel "should have objected to the many accusations of domestic hearsay." She addresses "accusations" raised in a 911 call and through John Hollins's testimony.

As to the Petitioner's complaint that Counsel allowed in "accusations" through the 911 call, the post-conviction court found;

> Trial Counsel affirmed that he filed a motion in limine to exclude the entire phone call. While acknowledging that 911 calls are generally considered nontestimonial in nature, Trial Counsel explained that the argument he made was the caller in this case, [the victim], was a lawyer "who gratuitously included things that were not necessary to resolve the situation." Although the trial court denied the motion and the appellate court affirmed the decision, Trial Counsel maintained his motion was the appropriate challenge tailored to the facts of this specific case, citing that the ultimate goal was to have portions of the 911 call redacted since there was a legal basis for the call's admission. The Court finds Trial Counsel's testimony credible and his decision a reasonable trial strategy.

The Petitioner argues that Counsel should have tried other means of excluding the recording of the 911 call; however, we find no deficiency with Counsel's strategy in this regard. Once again, because Counsel employed a strategy that did not prove successful does not mean Counsel was ineffective. *House*, 44 S.W.3d at 515. Counsel identified his argument as the basis for an exclusion of the evidence then drafted and filed a motion in limine in furtherance thereof. His strategy was both informed and reasonable and we cannot find fault solely on the basis that it was ultimately unsuccessful. *Id.* The Petitioner is not entitled to relief.

The Petitioner also argues that Counsel was ineffective for failing to object during the trial testimony of the victim's divorce attorney, Mr. Hollins and various documents associated with the parties divorce entered through Mr. Hollins. The record indicates that Counsel did object at one point; however, the Petitioner faults Counsel for not lodging continuing objections to Mr. Hollins's testimony. The Petitioner asserts that Counsel "should have been especially ready to object to nearly every word that came out of Hollins's mouth," but cites no specific testimony warranting an objection by Counsel. Further the Petitioner does not state what grounds existed for any objection to Mr. Hollins's testimony. Therefore, the Petitioner has not proven her allegation by clear and convincing evidence.

Counsel testified at the post-conviction hearing that the documents complained of were admissible as self-authenticating records; thus, he believed he had no basis for exclusion. The post-conviction court credited Counsel's testimony. After reviewing the record, we conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was ineffective in this regard. The Petitioner is not entitled to relief as to this issue.

### 8. Victim's Character

The Petitioner asserts that Counsel was ineffective for failing to attack the victim's character. The State responds that the Petitioner has failed to prove that David Dingler's opinion, Janice Holt's testimony, and the alleged statements of business associates who did not testify at the hearing would have been admissible; therefore, she is not entitled to relief. We agree with the State.

The post-conviction court found:

Petitioner's Counsel elicited testimony about [the victim]'s character, including: (1) Mr. Dingler testified about [the victim]'s business associates who told Mr. Dingler, "what comes around goes around" when they informed Mr. Dingler of [the victim]'s death; and (2) private

58

investigator Janice Holt testified about a cab driver (Nathan Stearns) whom she spoke to who provided hearsay related to [the victim]'s sexual history. Post-Conviction Counsel also introduced a collection of photographs, depicting what he characterized as a "paint ball mask" that he implied could have been used as part of sexual acts. The May 21, 2008 domestic dispute was touched on as well: "Given the arguably silly nature of charging a wife for squeezing her husband's bicep, trial counsel should have fiercely impeached the victim's character for truthfulness."

Post-Conviction Counsel questioned Trial Counsel about some of this proposed impeachable evidence. Trial Counsel testified that [the victim]'s "unfaithfulness [was] pretty well known" and that it came up during trial testimony at several points. Trial Counsel stated he was aware of rumors circulating about [the victim]'s sexuality, but he did not give them much credence. Trial Counsel knew Andrew Cate, one of [the] attorneys for Petitioner's civil proceedings, had hired investigator Janice Holt, and Trial Counsel had been present at a meeting with Mr. Cate and Ms. Holt, where Ms. Holt described her interview with a cab driver. Trial Counsel found the cab driver's statements "utterly ridiculous" and lacking credibility. Although Trial Counsel did not credit Ms. Holt, he testified that he made clear to Mr. Cate and Petitioner that they could pursue any leads, and he would not impinge upon their investigation. Trial Counsel interviewed some of [the victim]'s social friends such as Jim Weathers and Bob Delaney, both of whom knew [the victim] was unfaithful to his wife, but neither credited the rumors of homosexual affairs.

Trial Counsel affirmed that he knew the victim was found unclothed in the children's bedroom where he slept, and that police recovered a wine class with unknown female DNA, information that came before the jury. Likewise, Trial Counsel was aware that semen was recovered from the crime scene, but stated it is unknown whether or not the victim engaged in sexual relations before death since there is no proof and no ameli found in the semen. Trial Counsel, however, testified he had "never heard anything about a paintball mask" until the subject came up at the post-conviction hearing; thus, it was not an issue he considered for trial. Trial Counsel testified that he could not recall if police collected the bed sheets from the boys' room where [the victim]'s body was found. He did not recall seeing the bed sheets in the serology report. As part of pre-trial investigation, Trial Counsel went to the property room to view all of the physical evidence with General Miller.

The Court finds Trial Counsel's testimony credible. When asked as to why Trial Counsel did not introduce specific character evidence, Trial Counsel articulated a response demonstrating reasonable trial strategy based on investigation of the facts of the case.

Moreover, as the Court noted during the post-conviction hearing, although Post-Conviction Counsel cited character evidence that he referred to as "prior bad acts" of the victim, he did not provide any Rule of Evidence as to how any of the information brought forth during the post-conviction hearing could be admissible at tria1. None of the post-hearing briefing addresses this issue. The vast majority of evidence Petitioner proposes to introduce to show [the victim]'s "poor character" is inadmissible under the Tennessee Rules of Evidence, including Rules 404(b), 412, 403—to name a few. Accordingly, Petitioner's request for post-conviction relief is denied as to this claim as Petitioner has failed to meet her burden of clear and convincing evidence as to either prong of the Strickland standard. The Court notes, however, that some evidence such as [the victim]'s alcoholism and marital infidelity did come before the jury through other testimony.

(Citations to the record and footnotes omitted).

The evidence does not preponderate against the trial court's findings. The Petitioner is not entitled to relief as to this issue.

## B. Post-Conviction Court's Denial of the Petitioner's request to Touch and Tear Trial Exhibits

The Petitioner contends that the post-conviction court improperly denied her request to destroy and to touch sealed trial exhibits. The State responds that the post-conviction court did not abuse its discretion by denying the request. We agree with the State.

At the post-conviction hearing, the Petitioner alleged that latex material produces a jagged edge when it is torn, inconsistent with the smooth edge of the latex glove tip found near the victim's body. To demonstrate this, the Petitioner sought to tear the Walgreens gloves entered at trial as evidence. The post-conviction court denied this request. The Petitioner then sought to have the post-conviction court give "lay testimony" about the difference in how the glove tip found near the victim's body felt versus the Walgreens gloves. Once again, the post-conviction court denied the Petitioner's request and declined the invitation to serve as a lay witness.

60

In the order denying relief, the post-conviction court addressed the issue of the glove tip as it related to the Petitioner's ineffective assistance of counsel claim, finding it was "unclear" what relevance there was in whether the glove was torn or cut.

We agree with the post-conviction court that the Petitioner has not shown the relevance of whether the latex glove tip was cut or ripped. The Petitioner's DNA was found on the glove tip that was located near the victim's body. This DNA evidence is unchanged regardless of whether the tip was ripped or torn. A demonstration at the post-conviction hearing involving the latex glove would have no consequence unless the demonstration aided the post-conviction court in determining that the Petitioner had suffered prejudice at trial.

The Petitioner notes that, at the post-conviction hearing, the post-conviction judge stated that it was not the trier of fact. It appears this was a misstatement by the judge who was understandably troubled by the Petitioner's unconventional request that the judge provide lay testimony during the post-conviction hearing. We agree with the Petitioner that the post-conviction court is the trier of fact in a post-conviction hearing which is the primary reason that the post-conviction court should not also offer testimony at the post-conviction hearing. The Petitioner is not entitled to relief as to this issue.

## C. Warrants

The Petitioner claims that she was deprived of her federal and state constitutional rights to be free of unreasonable searches and seizures and that she was deprived of the opportunity to pursue the search-and-seizure claim because of the ineffective assistance of her trial counsel.

We have already considered the Petitioner's claim as it relates to ineffective assistance of counsel. Now, we consider the Defendant's claim of constitutional shortcoming related to the search and seizure. This claim of a free-standing constitutional error must fail, however, because the issue was not presented to the trial court via a pretrial motion to suppress as is required by Tennessee Rule of Criminal Procedure 12(b)(2)(c). The failure to pursue a pretrial motion constitutes waiver unless good cause is shown for the failure to move for suppression in a timely manner. Tenn. R. Crim. P. 12(f); *State v. Roger Odell Godfrey*, No. 03C01-9402-CR-00076, slip op. at 3-4 (Tenn. Crim. App., Knoxville, Mar. 20, 1995); *State v. Hamilton*, 628 S.W.2d 742, 744 (Tenn. Crim. App.1981); *State v. Zyla*, 628 S.W.2d 39, 41 (Tenn. Crim. App., 1981); *State v. Davidson*, 606 S.W.2d 293, 295 (Tenn. Crim. App. 1980).

61

There was no good cause for failing to pursue the suppression motion to a hearing and a dispositive order. In fact, as we concluded above, failure to pursue the matter was a calculated, deliberate action of trial counsel. As a result, the free-standing constitutional search-and-seizure issue is waived. *See* T.C.A. §§ 40-30-106(g) (2012); *see also State v. Miller*, 668 S.W.2d 281, 286 (Tenn. 1984).

Justice McCanless, speaking for the Court, in *Arthur v. State*, 483 S.W.2d 95 (Tenn. 1972), explained the reasoning:

> There must be a finality to all litigation, criminal as well as civil. The courts, the executive branch of government, the legal profession, and the public have been seriously inconvenienced by the prosecutions of baseless habeas corpus and post-conviction proceedings. Defendants to criminal prosecutions, like parties to civil suits, should be bound by the judgments therein entered. When they fail to make timely objection to errors of the courts they must not be allowed at later times of their own choosing - often, perhaps, after witnesses against them have become unavailable - to assert those grounds in post-conviction actions.

483 S.W.2d at 97.

We agree that it is not permissible for a defendant in a criminal case to pursue a particular strategy at trial upon one ground, deemed by the defendant to be proper, and then, later in a proceeding for post-conviction relief, to assert that this strategy now complained of violated a constitutional right; failure to assert the constitutional ground at trial must be held to constitute a waiver of the right to make such an objection. *State v. Miller*, 668 S.W.2d 281, 286 (Tenn. 1984).

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the Petitioner was afforded the effective assistance of counsel. Further, we conclude that the post-conviction court did not err when it denied the Petitioner's request to destroy trial exhibits and declined to provide lay testimony. Finally, we conclude that the Petitioner waived our review of her free-standing constitutional claim that the warrants were overly broad. Accordingly, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE